STACY, C. J., BARNHILL and WINBORNE, JJ., concur in result.
SEAWELL, J., took no part in the consideration or decision of this case.
The complaint of plaintiff is as follows:
"Plaintiff's relator, John G. Carpenter, solicitor of the Fourteenth Judicial District of North Carolina, complaining of the defendant, alleges:
"1. That plaintiff's relator is now and was at the time hereinafter mentioned the duly elected, qualified and acting solicitor of the Fourteenth Judicial District, State of North Carolina, and is a citizen and resident of Gaston County, North Carolina, which said county is in said Fourteenth Judicial District.
"2. That the defendant is a resident and citizen of Mecklenburg County, N.C.
"3. That the defendant owns and operates a place of business on United States Highway No. 74, known as Wilkinson Boulevard, which said place of business is called `Greenwich Village' and is several miles west of the city of Charlotte; that upon information and belief said defendant is the owner and proprietor of said business and has been for some time.
"4. That said place of business known as `Greenwich Village,' owned and operated by the defendant herein, is located in a thickly populated rural community; but there is a great deal of traffic continually passing said place of business; that the neighborhood and vicinity of the `Greenwich Village' is thickly populated and the activities incidental to the operation of the said business by the defendant are easily seen and observed by citizens traversing said highway, and other residents and citizens in the immediate vicinity thereof.
"5. That upon information and belief said business known as `Greenwich Village' has been operated and is being operated by the defendant herein in such a way as to constitute a public nuisance and an affront to public morals and decency; that upon information and belief the defendant, his agents and servants, have been and are now engaged in the *Page 435 
business of selling liquor unlawfully and in large quantities; that upon the said premises are several cabins, which are flagrantly used by persons of low repute for the purposes of adultery, assignation, prostitution, lewdness and immorality; that the activities incidental to the business of the defendant in the illegal sale of whisky and other intoxicants, in the drunkenness, boisterous and disorderly conduct upon said premises, and in the flagrant violation of morality upon said premises have disturbed and affronted decent citizens of Mecklenburg County, and are a menace to public morals; that the defendant has been operating and engaged in said business known as `Greenwich Village' in such a way as to constitute a public nuisance; that unless said public nuisance is abated the users of the highway and the public generally will continue to be injuriously affected by the intolerable conditions existing in, around, and adjacent to the said establishment of the defendant.
"6. That the buildings, erections and premises, where business is carried on, and the tract of land upon which said buildings are located, together with said business, furniture, fixtures, money, merchandise, stock of goods, and other personal property of the defendant, which may be found in and about the said `Greenwich Village,' constitute a general public nuisance, and in the interest of public morals and decency should be abated.
"Wherefore, your relator prays —
"1. For an order perpetually enjoining and restraining the defendant from maintaining and operating said `Greenwich Village' to the end that said public nuisance arising therefrom may be abated; that all fixtures, furniture, musical instruments, personal or movable property used in connection with the said public nuisance shall be removed from the building in which said business is carried on, and that said furniture, and fixtures, and other personal or movable property be sold as by law provided.
"2. That the building in which said business is carried on be ordered closed against their use by the defendant, or any other person or persons, and that they be kept closed for a period of one year unless sooner released, and that the defendant be restrained from leasing said building to any other person or persons, firm or corporation, pending the further orders of this court, for a period of one year, unless otherwise ordered by the court.
"3. That it be provided in said order that the officer moving and selling the movable property be allowed the same fees as he would have been allowed for levying upon and selling like property under execution, and that the officer closing the premises and keeping them closed be allowed a reasonable sum by the court for such services.
"4. That out of the proceeds of the sale of the furniture, fixtures and other movable property, the plaintiff be allowed the costs of this action, *Page 436 
including a reasonable attorney's fee, and the balance, if any there be, be paid to the defendant herein.
"5. For such other and further relief as to the court may seem just and proper. Ralph V. Kidd, Uhlman S. Alexander, Attorneys. Verified 15 September, 1937, by John G. Carpenter, Solicitor, etc."
The defendant denied the material allegations of the complaint and prayed that the temporary order closing his business be dissolved. A temporary restraining order was issued on the verified complaint and affidavits and on the hearing the injunction was continued to the final hearing. The entire place was padlocked until the final hearing, without bond, and the matter was set for trial on 12 October, 1937.
On the trial the issue submitted to the jury and their answer thereto was as follows: "Has the defendant conducted and operated the place of business known as `Greenwich Village' in such a way as to constitute a nuisance? Ans: `Yes.'"
The evidence was to the effect: Jake Culp, a rural policeman, testified in part: "The reputation of Greenwich Village is bad. I know where it is located. I have had several occasions to go there and also have had several occasions to be called there. On some occasions we found a bunch of drunks fighting and locked up 4 or 5 of them. On several occasions we searched the cabins and got couples out of them and found several pints of liquor there. The couples we got there were nude men and women. I have been there on several different occasions when fighting was going on. I know Dr. Boyles. On some occasions we saw him there when we went there, also John Bingham and colored boys who work there, and another white fellow. Greenwich Village is located two and a half or three miles from Charlotte, on the Wilkinson Boulevard. On the front is a service station, dance hall and barbecue place. Behind it is one line of cabins. You can drive your car on the left and go in the cabins. They have one line of cabins further back, built the same way. The cabins are all at the rear of the main building. There is a dance hall in the front part of the building." J. V. Hamilton, a rural policeman, corroborated Culp.
Mrs. M. P. Randall testified, in part: "I live on Wilkinson Boulevard about 100 feet opposite Greenwich Village, across the street from it. The reputation of Greenwich Village is bad. It opened 18 October, last year, and the morning of the 30th I went over and talked with the man who was running the place, do not know his name. He was in Greenwich Village, said he was in charge of the place. I said my children have been woke up continually for a week or more, since the place has been opened, in the morning at 4 o'clock. It was in the morning at 4 o'clock when I went there. There was a drunken girl there cursing every breath. There was drunk person lying there and there were men drunk. This girl would let no one touch her. They wanted to take her *Page 437 
to town but she would not go. The manager wanted to call the officers. This was right in their door. They said they would take the girl in or call officers to come and get her. I asked her if she was going to work the next day and she wanted to know if it was any of my business. (Objection by defendant, sustained.) She cursed me and cursed the manager. She called him a s. o. b. time after time. The manager told her that if she called him that again he would slap the fire out of her. I have not gone there any other time. I have seen fights and cursing, one after another, and whiskey bottles in people's hands. I have seen people drive up in automobiles and go in the cabins. I am not on that side of it. I have seen automobiles drive in and out of the place frequently. They would stay different lengths of time. It has been a continual thing from the time they opened. We have been woke up by the cursing and noise over there. (Cross-examination): I can say my husband never drank liquor. He is here to testify against Greenwich Village, judge, I would like to slap his face. (Applauding in court room.) By the court: Do not let anyone clap their hands any more."
Mrs. C. A. Yates testified, in part: "I live on Pruitt Street, approximately 150 yards from Greenwich Village. Its reputation is bad. I live on the cabin side from it. I have one child 5 years old. I have heard and seen drunk men and women there nude. They would come from behind the cabins drunk and urinate there. I have not seen them take a drink, but have seen the effects of it. I have frequently seen automobiles drive up there with men and women and stay 40 or 45 minutes; when they would leave, others would come. I have met Dr. Boyles, have seen him on the premises often, day and night. I have noticed roughness, yelling and drunken men and women using profanity. I could hear this from my house, it would wake the family."
Mrs. H. E. McGinnis testified, in part: "I live directly behind the cabins of Greenwich Village. The edge of my front yard is about 50 feet from the last row of cabins. I have been living there about 9 years. The general reputation of Greenwich Village is bad. I have seen cars with N.C. tags on them, from early morning until all times of the night since the place opened up, going into the cabins, staying 30 to 45 minutes, just a boy and a girl. A drunkmen man and woman went in the cabins about 6 o'clock. I went to put up my car, saw a woman stumble over the children's playthings, she was so drunk it frightened them. They would wake me up anywhere from 11 at night until 6 in the morning. I have heard profanity of the worst type. I would say the people I saw were from 18 to 25 years old. I have seen Dr. Boyles about the premises from time to time, often when people were going in and out in the daytime, but did not see much at night. I saw a couple go in the cabins two months ago, got out of a taxicab. The driver waited for them about 45 minutes." Mrs. C. L. Rhyne corroborated the above witnesses. *Page 438 
The general reputation of the place was shown to be bad by Rev. E. K. McLarty, County Solicitor Merl M. Long, Bob P. Alexander, Paul Beatty, H. Lucas, H. C. Gurley, Mrs. P. A. Beatty, C. B. Strong, J. Frank Gilreath, Mrs. Clara Thompson, and Mr. and Mrs. C. L. Rhyne.
R. L. Winston testified, in part: "I live about 100 yards beyond Greenwich Village. The reputation of that place is bad. Since it has opened up I have lived 150 yards below there and 150 yards above. One place I lived I was single and have married since. . . . (Cross-examination): I have been there and bought sandwiches and medicine. I couldn't say where the fighting was. It looked like a commotion inside the door. I stopped opposite the door, a fellow came out and two or three followed him, this fellow hit him. I ran across the road and got behind an automobile, peeping at it. Probably 30 or 35 people came out, women, men and all were fighting. This was about 4 or 5 months ago, about 11:30 at night. They did not put anyone out because the cops did not come. A couple went in the woods, and a fellow was behind them with a chair round. He had broken it on someone's head, you could hear the licks from the road. He chased them in the woods from Dr. Boyles' premises. Everybody was running each other. One would fall down and then maybe this fellow would hit him, and he would get up and chase that one. The people who were doing the fighting ran into the woods."
C. T. McWhirter testified, in part: "I am the gentleman who was sent to the Insane Asylum following some trouble at Greenwich Village. I liked three days of spending two months there, was discharged by the officials as being cured. I have not been back there since discharged from there. I was discharged from Morganton the 20th day of September, this year, and am back at work. I was sent there 13 July, 1937. . . . I know where Greenwich Village is located, 5 miles out on the Wilkinson Boulevard. My trouble there was the latter part of May, on Sunday night. I had been there many times before. Q. State whether or not you had seen whisk sold there? You could get any brand you like if you had the price. You could buy whisky from the waitresses and darkies. Dr. Boyles, John Bingham and another little fellow were in charge there at the time, and were present when the whiskey was sold. I guess I have been to Greenwich Village 100 times. I did not raise a disturbance every time I went there. I never saw the sign `No Stags Allowed' until right recently. There was no wire partition there when I went there. I did go on the dance floor, you could not enter without going on the dance floor. I have not raised any disturbance there when recently. I did in the last stages, after they captured so much whiskey there. The taxicab driver did not beat me up because I would not pay him. These troubles ran me crazy and that bad liquor out there. I drank all the liquor I could get." *Page 439 
M. H. King testified, in part: "I live two blocks on yonder side of Greenwich Village. I am 17 years old. I went to Greenwich Village on Sunday morning about 10 o'clock after some whiskey. When I walked in Mr. Campbell and a Negro were sitting at a table reading the funny paper. I told them I wanted a half pint of Calvert Special. Campbell sent the Negro in the back after it. I asked him how much it was, he said 80 cents. I gave him one dollar, laid it on the table, put the stuff in my pocket, got 20 cents and went out. I go to Berryhill School. It was two or three months ago that I bought the liquor there, in July, either in July or first of August. I did not drink the liquor, I bought it for another fellow."
W. P. Randall testified, in part: "My home is diagonally across the road from Greenwich Village. From the time it was opened there has been a lot of noise there, would say from one month after it opened. I have seen taxicabs come there, dump out three or four girls, looked like 15 to 18 years old. Some would go in the Village and some run around to the cabins, that is not one time, but many times. It would be just about dark when I would observe this. These were dime taxis from Charlotte. Most of the noise was from midnight until daylight; cursing, swearing, hollering, screaming and just anything that you might say is loud noise. I don't think there have been over five nights in the last five months that I have not been awakened between midnight and 4 o'clock. I am not at home during the day, but sit on the porch in the late afternoon. I have seen Dr. Boyles drive up in his car and those Negroes would take out packages and carry them in the woods. They were about 12 inches square; they would stick them around in brush piles. When cars would come up they would go to the woods and bring something out. Don't know what was in those packages, but that continued all summer."
Dr. M. F. Boyles, the defendant, denied that his place of business was a nuisance and denied the material evidence of plaintiff. He alleged that he sold beer and wine and his evidence was to the effect that he kept an orderly place and had no knowledge of any disorder. He had been practicing medicine for 21 years. He admitted that he had been convicted on technical violation of the Narcotic Act and sentenced to Atlanta Prison for it — he served five months and was pardoned.
Two witnesses testified to his good character. One had known him two years and the other for a year and a half. The defendant testified, in part: "I completed my medical course at Warren, Pennsylvania, in one year. I went to Warren from San Diego, California. I was there a couple of years, went there shortly after I was pardoned from Atlanta. I had been in Gastonia, North Carolina, prior to that time, stayed in Gastonia about 8 years. I was taking courses during that time. I took post-graduate work in New York. I am a practicing physician and my *Page 440 
office is at Greenwich Village. I had blueprints made of my plans before I built Greenwich Village and a filling station was a part of the plan."
P. B. Campbell, a witness for defendant, testified in part: "My duty was in the capacity of clerk, to sell the patent drugs which doctor had there, tooth paste and things like that, and also to see that the place was kept clean and look after the place in general. . . . I have had experience at tourist camps before, one just outside of California. . . . We had many, tourists, some would take cabins and have dinner served in them. We had music, two automatic Victrolas. We had dancing, but did very little in the daytime. Anyone was privileged to drop a dime or quarter in the piccolo. We did not charge for dancing. We had registered tourists from out West. Many tourists registered there from places I had lived. I have lived practically all over the West. They came occasionally and knew people that I knew. Often we had people who were driving straight through, like for a funeral and they were rushing. In those cases we had people to stay one and one-half or two hours, rest in the afternoon and drive at night. Sometimes they would go in, wash up, come down and eat and leave, were nervous and did not want to rest. We operated as near as possible in hotel style with the facilities that we had there. I came here from Los Angeles, Calif. . . . I am sales clerk, can work in drug store or grocery store. I sold all patent medicines there. The box you show me is suppository, supposed to prevent conception. I never sold any of that stuff out there. It was there when I went there, was part of the stock Dr. Boyles brought there from the other store. I don't know where you order them from."
M. B. Parcell and W. E. Stout, witnesses for defendant, testified that they frequently visited the roadhouse and observed no disorder.
J. H. Bingham testified, in part, for defendant: "I started there a few days before Christmas. My duties in connection with the place were to keep order and be night clerk. I was in the place practically all of the time during the night. We use a card system of registration. We did not permit anyone to register except people that were man and wife. I remember the disturbance that took place there one night out at the service station. There was a bunch of girls and boys and they were pretty well lit up. I told them to get out, that I would not put up with it. They went out and got in a fight right, so I called the police and they came. I remember that Clyde McWhirter was there cutting up and they took him to Morganton. . . . I searched a man and got a pocketbook off of him that he had taken from another man. The only case I know of a man being beaten there was Mr. McWhirter. I remember that Christmas three young girls were brought in Judge Hunter's court and charged with stealing a pocketbook. I don't know *Page 441 
whether the girls were unescorted or not. A fellow, John Threatt, was arrested with them. There is not so much disorder there, when there is I tell them to get out. I have done that several times, would say a dozen. . . . I know that they give Greenwich Village a bad name now, but before this I don't know anything about it having a bad name. It was just like any other roadhouse I was ever in."
The court below rendered the following judgment: "This cause coming on to be heard before Hon. Wilson Warlick, Judge presiding over the 11 October, 1937, Regular Civil Term of Mecklenburg County Superior Court, and being heard before his Honor and a jury, and the following issue having been submitted to the jury and having been answered as hereinafter appears: `(1) Has the defendant conducted and operated the place and business known as "Greenwich Village" in such a way as to constitute a nuisance? Ans.: "Yes."' Now, therefore, upon motion of Ralph V. Kidd and Uhlman S. Alexander, attorneys for plaintiff relator, it is ordered, adjudged and decreed, that the buildings, erections and premises, where the business of the defendant Dr. M. F. Boyles has been carried on under the name of `Greenwich Village,' and the tract of land, belonging to the defendant, upon which said buildings are located, together with said business, furniture, fixtures, money, merchandise, stock of goods, and other personal property of the defendant, which may be found or which may heretofore have been found in and about the said property of the defendant, known as `Greenwich Village,' be and they are hereby declared to constitute a general public nuisance pursuant to chapter 60 of the Consolidated Statutes of North Carolina; it is further ordered, adjudged and decreed that the said buildings, erections and premises, and the tract of land upon which said buildings are located be and they are hereby ordered closed against their use by the defendant, or any other person or persons, and that said buildings on the premises known as `Greenwich Village' shall be kept closed for a period of one year from date hereof, unless sooner released, and the defendant herein is hereby restrained from leasing and forbidden to lease said buildings, erections or premises to any other person or persons, firm or corporation, pending the further orders of this court, for a period of one year from date hereof, unless otherwise ordered by the court." It is further ordered, adjudged and decreed that the defendant be and he is hereby enjoined and restrained from henceforth maintaining and operating said place of business known as "Greenwich Village" to the end that the said public nuisance arising therefrom may be abated; it is further ordered, adjudged and decreed that all fixtures, furniture, musical instruments, or other movable property which have been used by the defendant in conducting the said nuisance shall be removed by the sheriff of Mecklenburg County from the said building in which said business of the defendant has been carried *Page 442 
on, and that the sheriff of Mecklenburg County shall sell the said personal and movable property in the manner provided by law for the sale of chattels under execution. It is further ordered, adjudged and decreed that the proceeds of the sale of the personal property of the defendant as is hereinbefore provided shall be applied in the payment of the costs of this action and the abatement of said nuisance, and that out of the proceeds of said sale of personal property the costs and expenses of this proceeding shall be taxed by the clerk and that in said costs shall be taxed the fees of the sheriff of Mecklenburg County which have been incurred in closing and keeping closed said premises, and that said costs shall also include an attorney's fee of $200.00 to be alloted Ralph V. Kidd and Uhlman S. Alexander for their services in prosecuting the said action or proceeding on behalf of the plaintiff relator; and that such amount as may be left of the proceeds of said sale of personal property after the payment of the above enumerated costs and expenses shall be paid to the defendant Dr. M. F. Boyles. It is further ordered, adjudged and decreed that the defendant herein, Dr. M. F. Boyles, shall be taxed with the costs of this action. This 17 October, 1937. Wilson Warlick, Judge presiding."
The defendant excepted and assigned error to the judgment as signed, made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be considered in the opinion.
N.C. Code, 1935 (Michie), chapter 60, "Nuisances Against Public Morals," section 3180, is as follows: "Whoever shall erect, establish, continue, maintain, use, own, or lease any building, erection, or place used for the purpose of lewdness, assignation, prostitution, gambling, or illegal sale of whiskey is guilty of nuisance, and the building, erection, or place, or the ground itself, in or upon which such lewdness, assignation, prostitution, gambling, or illegal sale of liquor is conducted, permitted, or carried on, continued, or exists, and the furniture, fixtures, musical instruments and contents, are also declared a nuisance, and shall be enjoined and abated as hereinafter provided."
Section 3181: "Whenever a nuisance is kept, maintained, or exists as defined in this chapter, the city prosecuting attorney, the solicitor, or any citizen of the county may maintain civil action in the name of the State of North Carolina upon the relation of such city prosecuting attorney, solicitor, or citizen, to perpetually enjoin said nuisance, the person or persons conducting or maintaining the same, and the owner or agent of the building or ground upon which said nuisance exists. *Page 443 
In such action the court, or a judge in vacation, shall, upon the presentation of a petition therefor, alleging that the nuisance complained of exists, allow a temporary writ of injunction without bond, if it shall be made to appear to the satisfaction of the judge by evidence in the form of affidavits, depositions, oral testimony, or otherwise, as complainant may elect, unless the judge, by previous order, shall have directed the form and manner in which it shall be presented. When an injunction has been granted it shall be binding on the defendant throughout the county in which it was issued, and any violation of the provisions of injunction herein provided shall be a contempt, as hereinafter provided."
Subsection 3182 makes provision: When triable; evidence; dismissal of complaint. Section 3183: Violation of injunction; punishment. Section 3184: Order abating nuisances; what it shall contain. Section 3185: Application of proceeds of sale. Section 3187: Attorney's fee may be taxed as costs.
The competent evidence on the trial fully sustains the allegations of the complaint. Under section 3182, in part: "In such action evidence of the general reputation of the place shall be admissible for the purpose of proving the existence of said nuisance." The plaintiff introduced many witnesses who testified that the general reputation of the place was bad. The record discloses that Greenwich Village is a tourist camp with 12 cottages on the rear, 2 parking lots for cars and trailers, and a main building which consists of a filling station, drug store, physician and surgeon's office, dining room and kitchen — and part used for dancing hall. It is located on Wilkinson Boulevard and defendant herein is the owner and proprietor of the place.
The defendant appellant's brief sets forth 8 questions involved, which we will consider:
(1) Did the court err in denying defendant's motion to be permitted to withdraw answer and file demurrer?
(2) Did the court err in refusing to require the plaintiff to give bond for costs and an injunction bond?
(3) Did the court err in refusing to dismiss the action as being illegal and unconstitutional?
None of the above contentions of defendant can be sustained. The record discloses the following: "The above case was called for trial Tuesday, 12 October, 1937, at 10 a.m., before his Honor, Wilson Warlick. The defendant comes into court through his counsel, before expiration of 30 days after service of summons, and moves to withdraw answer and file demurrer. Where upon such motion the court finds the following facts: The summons was issued out of Superior Court, Mecklenburg County, 15 September, and was duly served on the defendant on 15 September, and that on the said day and at the time of issuing *Page 444 
summons, the complaint or petition in the cause was filed, and a copy of same was, as prescribed by law, served on the defendant with service of summons, thereupon completing service. Whereupon, thereafter, on 18 September, through his counsel, Tom P. Jimmison and A. A. Tarlton, defendant filed answer to the complaint; thereupon, pleadings being made up before this court, same is transferred by the clerk of this court for trial, and upon demand on defendant to exercise his preference as to setting, the case was set down for trial peremptorily Tuesday, 12 October, 1937, in Regular Civil Court, Mecklenburg County, and on the. morning of 12 October, when the case was called for trial, defendant made the above motion. Motion overruled, exception. The court stating to defendant, after selection of the jury, that he has right to demur ore tenus to the complaint or petition on the ground that it either did not state the cause of action, or that jurisdiction of the Superior Court is not good. After selection of the following jury: (naming them), and in the absence of the jury, the defendant through his counsel Jimmison and Tarlton demurs oretenus to the cause of action and complaint of the plaintiff, and moves to dismiss for the following reasons:
"1. That it does not appear of record that plaintiff was required to procure an order permitting him to sue in forma pauperis, or give any bond, or make deposit for costs before the alleged cause of action was instituted, as required by C. S., 493. Overruled; exception.
"2. That it does not appear of record that an injunction was required by the court, or given by the plaintiff or complainants as a condition precedent to the issuing of injunction, as required by C. S., 854. Overruled; exception.
"3. That the complaint does not state facts sufficient to constitute a cause of action, for that it fails to allege that the defendant is doing or permitting to be done some act, the commission or continuance of which during the litigation would produce irreparable injury to the plaintiff; that said complaint does not allege that the defendant is doing, procuring or suffering some act to be done in violation of the rights of the plaintiff, pertaining to the subject of the action, and tending to render a judgment against defendant ineffectual, that the complaint does not allege that the defendant threatens, or is about to remove, or dispose of his property with intent to defraud the plaintiff, and the complaint utterly fails to allege that the defendant is insolvent, as required by the Consolidated Statutes, before temporary injunction may issue. C. S., 843. Overruled; exception.
"4. That the complaint does not state facts sufficient to constitute a cause of action, for that the alleged cause of action is based upon a statute that is unconstitutional and void, for that it disseizes the defendant of his freehold, liberties, privileges, and deprives him of his property *Page 445 
without due process of law, which is in violation of the rights guaranteed to him by the Constitution of North Carolina, Article I, section 17. Overruled; exception.
"5. That the complaint in the above entitled action does not state the facts sufficient to constitute cause of action, for that the statute upon which the alleged cause of action is based deprives the defendant of his liberty and property, without due process of law, in violation of the rights guaranteed to him under United States Constitution, Article XIV, section 1. Overruled; exception."
It appears from the record that after the complaint and answer were filed the defendant exercised "his preference as to setting, the case was set down for trial peremptorily Tuesday, 12 October, 1937." It is well settled in this jurisdiction that the time set for trial of the case is in the sound discretion of the trial judge.
C. S., 518, is as follows: "If objection is not taken either by demurrer or answer, the defendant waives the same, except the objections to the jurisdiction of the court and that the complaint does not state facts sufficient to constitute a cause of action."
The defendant by filing an answer to the complaint in the Superior Court did not waive his right to demur ore tenus to the complaint on the ground that the court had no jurisdiction of the action and that the complaint does not state facts sufficient to constitute a cause of action. Finley v.Finley, 201 N.C. 1 (3).
All objections except those on the ground that the court has no jurisdiction of action, and that the complaint does not state facts sufficient to constitute a cause of action, are waived unless they are taken by demurrer or answer. But the exceptions referred to may be taken advantage of by demurrer even in the appellant court. Clements v. Rogers,91 N.C. 63 (64).
The court below ruled on defendant's demurrer ore tenus that it had jurisdiction of the action and the complaint set forth a cause of action.
The defendant moved to dismiss the action because plaintiff did not comply with C. S., 493, and give bond.
C. S., 3181, supra, in part says: "In such action the court, or a judge in vacation, shall . . . allow a temporary writ of injunction without bond." The undertaking in injunction proceedings, C. S., 854, is not applicable. The refusal of the trial judge to required a prosecution bond is not appealable. Christian v. R. R., 136 N.C. 321.
We think the allegations of the complaint and evidence plenary, and state facts sufficient to constitute a cause of action. That Art. I, sec. 17, of the Const. of N.C. and Art. XIV, sec. 1, of the Const. of the United States, are not impinged by the statute under which this action is brought. S. v. Webber, 107 N.C. 962, has no bearing on this case. In that case the municipal corporation (Asheville) had no power to *Page 446 
pass the ordinance under which defendant Webber was convicted. The present action is under a State statute and is constitutional in the exercise of the police power. Daniels v. Homer, 139 N.C. 219, where the matter is thoroughly discussed by Clark, C. J.
In People ex rel. Lemon v. Elmore, 256 N.Y. 489, it is held: "A statute authorizing courts of equity upon sufficient proof to issue an injunction against the maintenance of a house of prostitution and to direct the closing of the building in which the nuisance was maintained, for a year, or until the owner shall give bond against the reestablishment of the nuisance, does not violate the constitutional right of trial by jury." This case is carefully annotated in 75 A.L.R., 1292 (1298), and it is there said: "Decisions subsequent to the previous annotations on this subject have uniformly sustained the constitutionality of statutes conferring upon courts of equity power to abate a public nuisance, although the acts complained of also constitute a crime and no property rights are invaded."
In 46 C. J., p. 796, part sec. 425 (b), it is written: "The legislature may, and sometimes does, confer upon courts the authority to condemn and confiscate the personal property used, or permitted to be used, for the purpose of maintaining the nuisance; to order the personal property used in connection therewith sold, and the proceeds to be applied in payment of the costs; and to order the premises in which the nuisance has been conducted closed for a stated period, in the absence of the giving of the bond as provided in the statute, and the payment of costs."
(4) Did the court err in permitting the introduction of hearsay evidence of Merl M. Long and in denying the defendant the right to explain said evidence? We think not.
The defendant assigns as error the admission of certain testimony of the witness Long, solicitor of the county recorder's court. The witness testified that numerous complaints had been made to him in his official capacity as to conditions at the defendant's place of business. We think that such testimony was competent as corroborative evidence, under the provisions of section 3182, which provides that evidence of the general reputation of the place shall be permissible for the purpose of proving the place a nuisance. The defendant also objected to the following question: "This boy, Lanier, was working for Dr. Boyles at the filling station, was he?" Conceding, but not deciding, that the question was incompetent and the evidence hearsay, an objection to it was overruled and the witness replied: "He said he was." The defendant made no motion to strike out this answer. The record discloses that no exception was entered at the time by the defendant to the answer of the witness, nor was any motion made by defendant to strike said answer from the record. Under these circumstances the defendant cannot now complain of error. (Ins. Co. v. Boddie,196 N.C. 666.) If such was error *Page 447 
it was harmless in view of the overwhelming mass of other evidence in the record as to the flagrant and unlawful use of the premises of the defendant.
(5) Did the court err in permitting the testimony of C. T. McWhirter, an insane person? We think not, under the facts appearing in the record.
The record discloses: "Motion by defendant to strike out the evidence of C. T. McWhirter on the grounds that as it appears of record he is still an inmate, or under the supervision of, the Insane Asylum of Morganton, and that it appears of record that he was crazy at the time of the happenings he testified about. (By the court) `To the foregoing motion of defendant to strike out the evidence of plaintiff's witness C. T. McWhirter, the court having heretofore found, upon examination of the witness when placed on the stand from questions propounded and answers given, that the witness, though having heretofore been declared insane and subsequently has been released, has mental capacity to testify to the facts, and as such rules the witness to be competent, and having previously so ruled thereupon, disallows the motion at this time to strike out the evidence of C. T. McWhirter.'" This was in the sound discretion of the court below.
It is said in Lanier v. Bryan, 184 N.C. 235 (238): "The decision (Shawv. Moore, 49 N.C. 26), approves the doctrine that the witness should have due appreciation of a moral duty to tell the truth, and conforms to the general rule that the judgment of the trial judge on the question of competency of a person who is offered as a witness is a matter of discretion and will not be disturbed on appeal, unless there is an abuse of discretion, or unless the order admitting or rejecting the witness involves the erroneous construction of a legal principle," citing numerous authorities.
(6) Did the court err in refusing to submit the issue tendered by the defendant? We think not.
The record discloses that the defendant tendered an issue, but that he did not except at the time to the refusal of the court to submit the said issue, nor did the defendant except to the issue which was submitted to the jury by the court. The defendant cannot now, after the trial and verdict, except to the refusal of the court to submit the issue which he tendered, he not having excepted thereto at the time. Green v. Bechtel, 193 N.C. 94; McIntosh, Prac. Proc. in Civil Cases, pp. 545-6, sec. 510.
(7) Did the court err in charging the jury? We think not.
The court charged the jury as follows: "Nuisance can be a public or private nuisance. The nuisance referred to here is a public nuisance. That is a nuisance to the public in general, not a nuisance to one in particular. Nuisance of this character refers to public nuisance, that *Page 448 
is one that is detrimental to the public. A nuisance within the meaning of this statute means — anything which works hurt, inconvenience or damage to another, or which essentially interferes with the enjoyment of life or property to the public in general, near or about the premises. The fact that the acts done may be otherwise lawful does not keep it from being a nuisance." The charge must be considered contextually and not disjointedly. Taking the charge as a whole, we do not think the above excerpt, if error, is prejudicial. It is the combination of the "acts done" that may become a nuisance and the evidence of such is abundant on this record.
(8) Did the court err in refusing to allow the defendant to give bond to abate any nuisance? We think not.
C. S., 3186, says, in part: "The court may, if satisfied of his good faith, order the premises closed under the order of abatement to be delivered to said owner, and said order of abatement canceled so far as same may relate to said property." Under the above statute this was in the sound discretion of the court below.
Schenck, J., while on the Superior Court bench, tried the case of S. v.Everhardt, 203 N.C. 610. His charge as to what constituted a public nuisance was affirmed by this Court. In that case we cited many authorities, among them (at p. 618) Clark's Crim. Law (2d Ed.), Hornbook Series, part sec. 115, at p. 345, where it is said: "To constitute a public nuisance, the condition of things must be such as injuriously affects the community at large, and not merely one or even a very few individuals. . . . (p. 346). Whatever tends to endanger life, or generate disease, and affect the health of the community, whatever shocks the public morals and sense of decency; whatever shocks the religious feelings of the community, or tends to its discomfort — is generally, at common law, a public nuisance, and a crime. . . . (p. 348). Disorderly houses, including houses of ill fame and drinking or tippling houses, kept in such a way as to annoy and scandalize the public, are nuisances at common law."
The facts in the present case are similar to those in the Everhardtcase, supra. The defendant in the present case could have been indicted and convicted of the same offense alleged and proved in the Everhardt case,supra. C. S., chapter 60, "Nuisance Against Public Morals," under which defendant was tried, provides for the abatement of a nuisance. "An order of abatement shall be entered as a part of the judgment in the cause, which order shall direct the removal from the building or place of all fixtures, furniture, musical instruments, or movable property used in conducting the nuisance, and shall direct the sale thereof in the manner provided for the sale of chattels under execution, and the effectual closing of the building or place against its use for any purpose, and so keeping it closed for a period of one year, unless *Page 449 
sooner released," etc. C. S., 3184, "Padlocking" is a rigorous legal cathartic, but, just as in the case of the individual, so in society; at times violent dosages are necessary to rid the body of poisons, also the cancer on the body politic must be removed and destroyed.
The jury found that the defendant Dr. M. F. Boyles, trading and doing business as "Greenwich Village," conducted and operated a place of business in such a way as to constitute a nuisance. The facts, as developed by plaintiff, show the social viciousness of the enterprise. Dr. Boyles was previously convicted of failure to keep proper narcotic records, and was sent to the Federal Prison at Atlanta. Receiving a pardon after only five months, he returned to Charlotte, built "Greenwich Village" in a thickly settled community on Wilkinson Boulevard. This tourist camp quickly developed into a nest of vice, pandering to the lowest and most animal qualities of men and women. Here there was a filling station, a drug store, a physician and surgeon's office, a dining room and a kitchen. In the front of the building there was a dance hall with music from the piccolo. Wine and beer were sold openly, and only slightly less open was the sale of suppositories for the prevention of conception. Liquor was sold there and defendant was a doctor and had theretofore been convicted of selling morphine. The twelve tourist cottages and two parking lost became an inviting assignation place. Taxicabs from Charlotte plied back and forth — always the same story, a man and woman retiring to a cottage for forty or forty-five minutes, then returning to the cab. On several occasions the rural police raided this citadel of iniquity. The revolting scene which greeted them was peopled with fighting and drunk men and women, with many of both sexes nude or indecently clad. There was fighting, yelling and cursing and ribald and indecent profanity on the part of both men and women. Such conduct continued throughout the night. This roadhouse was open day and night and on the Sabbath. This was the history of the spot from the time it was created by the defendant. One witness testified: "I have been living there about nine years. The general reputation of Greenwich Village is bad. I have seen cars with N.C. tags on them, from early morning until all times of the night since of the place opened up, going into the cabins, staying thirty to forty-five minutes, just a boy and girl. A drunken man and woman went into the cabins about six o'clock. . . . I went to put my car up, saw a woman stumble over the children's playthings, she was so drunk it frightened them. They would wake me up anywhere from eleven at night until six in the morning. I have heard profanity of the worst type. I would say the people I saw were from eighteen to twenty-five years old. . . . I saw a couple go into the cabins two months ago, got out of a taxicab. The driver waited for them about forty-five minutes." This testimony was corroborated by many. Numerous witnesses swore that the general reputation of the place was bad. *Page 450 
From all the evidence on the part of plaintiff, it was shown that defendant was maintaining a roadhouse on a congested highway in a populated neighborhood and a few miles from the city of Charlotte; the defendant's place of business was one where liquor was sold flagrantly and in large quantities and in violation of law; the defendant permitted the cabins on his premises to be utilized for the purpose of prostitution, lewdness, and assignation; the defendant permitted taxicabs to bring young girls and boys from the city of Charlotte and from other towns and to use his premises for the purpose of immorality and adultery; the general conditions in and around defendant's place of business were detrimental to public morals and were an affront to the good citizens in the neighborhood and community in which the said place was located; under all the evidence the jury was justified in holding that the defendant was maintaining and conducting a nuisance.
Centuries ago the Almighty entered a judgment, "destruction by fire," against two cities in the plain of the Jordan. Today the fire of the law must sometimes be applied by upright citizens to the Sodoms and Gomorrahs that have sprung up along our highways, creating nuisances against public morals. In an age in which the respect for law and order has well-nigh withered away, the power of righteous indignation which springs from deep moral convictions, it is encouraging to find patient and long-forbearing, but upright, citizens aroused against cancerous growths on our social body. They will find the processes of the law ever ready and adequate for such social surgery, all too often necessary to the wholesome health of society.
We see no error in the judgment of the court below.
No error.
STACY, C. J., BARNHILL and WINBORNE, JJ., concur in result.
SEAWELL, J., took no part in the consideration or decision of this case.