### THOMAS M. STATON v. THE NORFOLK AND CAROLINA RAILROAD COMPANY.

*Damages—Drainage of Surface Water—Railroad Charter—Constitution—Magna Charta—Legislative Powers—Taking Private Property for Public Purposes—Eminent Domain.*

1. The authority granted to a corporation by its charter to construct a railroad does not thereby confer upon it an immunity from liability for damages to others in respect of their adjacent lands, when, under the same circumstances, a private individual would be liable.

2. Such immunity expressly granted by the Legislature would be in conflict with the Magna Charta and the Constitution.

3. The words "deprived" and "taken," in the Magna Charta (Declaration of Rights, sec. 17), are broad enough to include *damages* to land.

4. The use of "ordinary skill and caution" in the construction of the work is not sufficient to protect from liability if there was a failure to provide against a danger which might have been foreseen.

This was a CIVIL ACTION, tried by *Brown, J.*, at the May Term, 1892, of HALIFAX Superior Court.

The suit was for damages for flooding land. There was a verdict and judgment for plaintiff. Defendant appealed. The material facts may be gathered from the opinion of the Court.

*Mr. R. O. Burton*, for plaintiff.
*Messrs. T. N. Hill* and *W. H. Day*, for defendant.

SHEPHERD, C. J.: In the case of *Jenkins* v. *Railroad Co.*, 110 N. C., 438, we had occasion to say, in respect to the drainage and diversion of surface-water, that "a railroad company enjoys the same privileges as any other landowner, but no greater, to be exercised under the same restrictions and

qualifications," and that it "has a right to cut ditches (on its right-of-way) and conduct the surface-water into a natural watercourse passing through its land, and if this right is exercised in good faith, and in *a reasonable manner*, for the better adaptation of the land to lawful and proper uses, no damages can be recovered if the lands of the landowner are injured." In the opinion in that case we did not attempt to lay down any precise rule as to what would be a reasonable exercise of the privilege under all circumstances, and in confining ourselves to the enunciation of a few general principles, we but followed the example of the highest courts both in England and America.

Indeed, it would be impossible to anticipate the many and varied phases in which this difficult subject may be presented, and it is believed that any effort to do so would be attended with a practical denial of justice in many instances. We stated, however, that "if the watercourse is inadequate, and injury may result to a lower owner, the right to cut such ditches must be confined strictly to mere surface-water," and that it would be an unreasonable exercise of the right if the ditches were so constructed "as to divert the surface-water from a direction in which, by the general inclination of the land, it naturally flows."

In the present case there was abundant testimony tending to show the existence of the qualifying conditions just stated, and the charge of his Honor in this respect is fully sustained by the principles declared in the decision to which we have referred. If his Honor deviated at all from these principles (and we are rather inclined to the opinion that he did in a slight degree), it was in favor of the defendant, and it can therefore have no just ground of complaint.

As we understand it, the exceptions most seriously relied upon are addressed to the refusal of the Court to give the instructions prayed for, and these substantially involve the proposition, that inasmuch as the Legislature has authorized

the defendant to construct its road, it is not liable to an adjacent proprietor for any damage incident to such construction, provided the work is necessary and is skillfully and carefully performed. In other words, it is insisted (notwithstanding our declaration to the contrary in Jenkins's case) that a railroad company, under such circumstances, is entitled to greater privileges than an individual, and that where the latter would be liable for a violation of the principles embodied in the maxim *sic utere tuo ut alienum non lædas,* the former would be exempt from all responsibility whatever, and this upon the theory that the damage is supposed to be "consequential," for which no action can be maintained. In support of this view it is asserted that a railroad is for the benefit of the public, and that, in the very authority to construct it, there is an implied subordination by the Legislature of the rights of individuals. This may all be true when compensation is provided, as where land is actually condemned and taken as a right-of-way, but it would be a strange measure of justice to require a railroad company to pay only for a narrow strip of land about fifty or one hundred feet in width, and at the same time practically confer upon it the privilege of destroying thousands of acres of the land of adjacent proprietors without either the duty of making compensation, or the liability to a common law action for damages. It would be of small comfort to the ruined proprietor to be told that he must bear his loss for the benefit of the public, and it would not be unnatural if he answered that if the public good required the destruction of his property, an enlightened sense of public justice should demand that he be compensated for his loss. In this he would be sustained by the words of Sir William Blackstone, that "the public good is in nothing more essentially interested than in the protection of every individual's private rights." 1 Blackstone Com., 138.

It is true that some of the cases from other States, cited by the defendant's counsel, go to the extraordinary length

of sustaining his proposition; but these are not in accord with the more recent and better authorities, and they are rapidly being submerged by the steady and increasing current of judicial decision.   Mr. Lewis, in his excellent work on Eminent Domain, section 566, referring to cases of a similar character, remarks that underlying such decisions ·" is an erroneous assumption as to the rights acquired by the purchase or condemnation of property for public use. This assumption is that there is acquired, not only all the ordinary proprietary rights in the property taken, but also certain proprietary rights which pertain to the property not taken.   *   *   *   There is no warrant for this assumption, either in reason or authority, outside of the particular cases referred to.   There is no reason why a railroad, in purchasing or condemning property for its use, should be held to acquire anything more than would be acquired by a private individual purchasing the same property for the same use." After speaking of the liability of such a private individual for any actionable injury to the adjacent land, "either by depriving the soil of its support, by interfering with the flow of running streams or otherwise," the author proceeds: "So, with a railroad when it acquires a right-of-way through a tract of land; it becomes an adjoining proprietor with the owner of the tract, with precisely the same rights and duties with respect to such owner as though the strip of land had been acquired by an individual for ordinary use, except the unqualified right of operating the road in a reasonable and proper manner; and so with every description of taking for public use   In adapting the property taken to the use proposed, the public, or its agent, is subject to the law of adjoining proprietors, and to the maxim *sic utere*, etc.   If, in such adaptation, the adjacent owner's rights of property are violated, he is entitled to compensation, not on the ground of a want of skill or diligence in constructing the works, but *because his constitutional rights of property have been violated.*"

At an early period in our history, some of the constitutions of the States contained no provision that private property should not be taken for public use without just compensation, but so repugnant to natural justice, as well as to the constitutional principles of the mother country, was the assertion of the right, that the Courts of these States unhesitatingly pronounced against such an assumption of legislative authority. Some of them declared that it was against the fundamental principles of natural justice and equity; others rested their decision upon the ground that it was in conflict with a provision of the Federal Constitution upon the subject (which, however, is only a limitation upon the Federal Government); while others reached the same conclusion upon the more satisfactory principle that it was inhibited by certain provisions of Magna Charta which had been incorporated into their organic laws. All of the States, however, except North Carolina, now contain express provisions that "private property shall not be taken for public use without just compensation," and owing to the restricted interpretation of the word "taken" (improperly, we think, applying it exclusively to property actually condemned), several of them have added the words "or damaged," or language of similar effect. We cannot ascribe to our lawmakers, in authorizing the construction of railroads or other corporate works, the purpose of granting them privileges so violative of the rights of the private property owner, and, we feel assured, that in conferring such privileges, it was intended that they should be accompanied in their exercise with the same restrictions and duties as those which are applicable to adjacent proprietors. Had the Legislature done otherwise, its action would have been contrary to the principles of our Constitution, and therefore of no validity. It is true, as is said in *State* v. *Wilson*, 107 N. C., 865, that we have no specific provision in our fundamental law upon this subject, but we have the broad and comprehensive language

of Magna Charta: "No person ought to be taken, imprisoned or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." Declaration of Rights, sec. 17.

In *Railroad* v. *Davis*, 2 D. & B., 451, this provision was referred to by Judge GASTON, who intimated that it was "restrictive of the right of the public to the use of private property, and impliedly forbids it without compensation." In *Cornelius* v. *Glen*, 7 Jones, 512, the power of the Legislature to take property for public use without compensation is expressly denied, and to the same effect is *State* v. *Glen, Ibid*, 321. In the latter case, Judge BATTLE, in delivering the opinion of the Court, after quoting the words of Judge GASTON, *supra*, and referring also to the Declaration of Rights, said: "Had the case demanded it, we cannot doubt that the Judges who then composed the Court would have decided in favor of the restriction, and in so doing they would have found themselves sustained by similar decisions in many of our sister States." In *Johnson* v. *Rankin*, 70 N. C., 550, the Court (RODMAN, J.) referred to the foregoing cases with approval, and stated that the principle had "never been denied to be a part of the law of North Carolina."

The cases which hold that the use of the word "taken" in constitutional provisions for compensation excludes the common law, and indeed, all other remedy for the redress of injuries to adjacent property not actually condemned or purchased under circumstances where an individual would be liable, are, in our opinion, unsupported by either reason or principle. We suspect that they were influenced to a great extent by English decisions upon statutes which either expressly or by implication, deprived the adjacent proprietor of his right to damages. The strength of such decisions is much weakened when it is considered that, while the legislation upon which they are founded may be clearly in con-

flict with the constitutional principles of the English Government, it is nevertheless valid because of the omnipotence of Parliament, and it is therefore the duty of the Courts to administer the law as it is enacted. With us, however, these principles operate as limitations upon the authority of the Legislature, and when it exceeds such limits its acts are invalid, and of no force whatever. Cooley Const. Lim., 6. It seems clear that such legislation is in conflict with the above-mentioned provision of Magna Charta, which was considered broad enough by Blackstone and other writers, not only to inhibit the mere taking of property, but also to protect the owner in its "free use and enjoyment, * * * without any control or diminution." 1 Bl. Com., 138. The word "deprived," therefore, as used in our Constitution, has been substantially declared by the great commentator to be insusceptible of such a narrow and restricted meaning. Even if the word were synonymous with "taken," the weight of authority is decidedly against such construction. Without attempting to quote to any extent from the opinions of the various Courts, we will reproduce the following language of the Supreme Court of the United States (Justice MILLER) in *Pumpelly* v. *Green Bay,* 13 Wall., 166:

"It would be a very curious and unsatisfactory result, if, in construing a provision of constitutional law always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can in effect subject it to total destruction without making any compensation, because, in the narrowest sense

of that word, it is not *taken* for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as these rights stood at the common law, instead of the government, and make it an authority for the invasion of private right under pretext of the public good, which had no warrant in the laws or practices of our ancestors."

It will be noted that this was an action of trespass for overflowing the plaintiff's land, and it was claimed that there was no "taking" and that the damage was a consequential result of a work authorized by the Legislature of Wisconsin. This case is therefore exactly in point.

In *Eaton* v. *Railroad*, 51 N. H., 504 (a leading case which has been recognized as authority in many of the States), the plaintiff sued the defendant for damages for cutting through a ridge in constructing its road, whereby his lands were flooded. It was conceded in the case that if the cutting had been done by a private landowner, he would be liable. The Court said: "To constitute a 'taking of property' it seems to have sometimes been held necessary that there should be 'an exclusive appropriation,' a 'total assumption of possession,' a 'complete ouster,' an 'absolute or total conversion of the entire property,' a 'taking the property altogether.' These views seem to us to be founded upon a misconception of the meaning of the term 'property,' as used in the various State Constitutions. In a strict legal sense, land is not 'property,' but the subject of property. The term 'property' * * * denotes a right over a determinate thing. 'Property is the right of any person to possess, use, enjoy and dispose of a thing.' Seldon, J., in *Wynehamer* v. *People,* 13 N. Y., 378; 1 Bl. Com., 138; 2 Austin on Jurisprudence, 817. If property in land consists in certain essential rights, and a physical interference with the land substantially subverts one of those rights, such interference 'takes' *pro tanto* the owner's property. * * * The injury complained of in this case is

not a mere personal inconvenience or annoyance to the occupant. Two marked characteristics distinguish this injury from that described in many other cases: First, it is a physical injury to the land itself, a physical interference with the rights of property. * * * Second, it would clearly be actionable if done by a private person without legislative authority. We think there has been a taking of the plaintiff's property ; that, as the statutes under which the defendants acted made no provision for the plaintiff's compensation, they afford no jurisdiction ; that defendants are liable in this action as wrongdoers, and that the ruling of the Court (that they are liable) was correct."

The clearness and strength with which the above principles are expressed must be our excuse for such lengthy quotations. They represent the better reasoning upon the subject, and are sustained by a considerable number of authorities, collected in Lewis on Eminent Domain, and other works of a similar character. Mills on Eminent Domain, 184 ; Cooley Const. Lim., 670 ; *Armond* v. *Green Bay Co.*, 31 Wis., 316; *Grand Rapids, &c.,* v. *Jarvis*, 30 Mich., 308 ; *Weaver* v. *Miss. Co.*, 28 Minn., 534 ; *Rhodes* v. *City of Cleveland,* 10 Ohio, 159 ; *Pettigrew* v. *Evansville*, 25 Wis., 228 ; *Cannif* v. *San Francisco*, 67 Cal., 45 ; *Hooker* v. *New Haven*, 14 Conn., 146; *Nevins* v. *Peoria*, 41 Ill., 502 ; *Railroad* v. *Dick*, 9 Ind., 433 ; *Kemper* v. *Louisville*, 14 Bush, 87 ; *Lee* v. *Pembroke*, 57 Me., 481 ; *Fall River Co.* v. *Plymouth*, 14 Gray, 155 ; *O'Brien* v. *St. Paul*, 25 Minn., 534 ; *Foster* v. *Stafford*, 57 Vt., 128 ; *Lahr* v. *Railroad*, 104 N. Y., 268.

We are not unmindful of the case of *Meares* v. *Wilmington*, 9 Ired., 73, in which there are some expressions which seem to support the contention of defendant. It is there stated that the city would not have been liable for the injury incident to the grading of the street if the work had been done with "ordinary skill and caution." The force of that decision is broken by the construction put upon it by the

Court in *Wright* v. *Wilmington*, 92 N. C., 156, as it seems that however carefully and skillfully the excavation may have been conducted, the city would still have been liable (and, indeed, was held liable) in failing to provide against any danger that might have been foreseen. This is not deemed by Mr. Dillon (see quotations in the opinion) as consistent with the general principle stated, and in Wright's case, *supra*, it seems to have been further stripped of the peculiar significance for which it is now urged, by the intimation, if not, in fact, the substantial declaration of the Court, that it is the duty of the city "to cause the streets so to be made, and with sufficient side-drains as to remove, without injury to adjacent lots, such surface-water as, from experience and knowledge of the past, may be reasonably anticipated to fall and may be provided for." The rule thus applied would not be inconsistent with the principle we have laid down. Without attempting to state the principle as applicable between a municipal corporation and its citizens, it is sufficient to say that it is subject to many modifications under certain conditions, and that what would be "consequential" damages as between them, in some instances, would be actionable by a proprietor whose lands were adjacent to the city. Those who purchase lots in a city bordering on streets are supposed to calculate upon such changes as the increasing population may require, and there are many injuries which are considered to have been within the contemplation of the parties when the street was either purchased or condemned. These considerations, however, are not applicable to railroads, or even municipal corporations, when actionable injury is inflicted by them upon the lands of adjacent owners, and the decisions we have noticed have never, so far as we are aware, been judicially recognized in this State as authority in such cases. On the contrary, the point now under consideration seems never to have been passed upon, and the late Chief Justice SMITH, in *Salisbury*

v. *Railroad,* 91 N. C., 490, considered it an open question and "not free from difficulty."

In consideration of the foregoing reasons and authority, we are of the opinion that the principle laid down in Jenkins's case is correct, and that the authority granted to the defendant to construct its road does not confer upon it an immunity from liability for damages inflicted upon the lands of adjacent proprietors where such damage would, under the same circumstances, be actionable against individuals. We are also of the opinion, as we have before stated, that had such immunity been expressly granted by statute, such legislation would have been in conflict with the Constitution, and therefore void.                                    Affirmed.