Upon appeal from the municipal-county court of the city of Greensboro, the defendants were tried at the December Term, 1941, of Guilford Superior Court on a warrant charging them with maintaining a nuisance in the city of Greensboro, in that they "leased and used a building and premises therein and maintained an office for the purpose of unlawful gaming and gambling, and where unlawful gaming and gambling was continuously carried on, in the thickly populated business district of the city of Greensboro, North Carolina, and where a large number of people daily congregated for the purpose of unlawful gaming and gambling, by betting and wagering on horse races, and where they did unlawfully gamble by betting on the results of horse races, all of which was a menace to public morals and constituted a common nuisance to the public generally."
The jury rendered a special verdict, finding facts substantially as follows:
The defendant Brown, with the assistance of his employee Yow, operated a place of business in Greensboro, equipped with means of receiving and disseminating information with reference to horse racing by means of blackboard, megaphone or loudspeaker, teletype, sporting newspapers, especially those relating to horse racing, desks, and telephones. At this place Yow received, and then transmitted to his employer, Brown, at 222 1/2 South Green Street, the main office or place of business, results of horse races run on courses outside of North Carolina, by means of connecting telephones. Both of said places were equipped and were designed and intended for the purpose of receiving offers of wagers on horse races held at various places outside North Carolina. The physical equipment could be used, and was used, to indicate and report the progress of races while being run, including an 80-foot blackboard in constant use during business hours for carrying information concerning the races. In the place at 222 1/2 South Green Street, there was an auditorium with fifty seats and standing room for one hundred additional persons.
A ledger was kept by Brown, showing data with reference to "Transactions for Horse Wagers," with statement showing offers of wagers received by Brown from a customer through a period from 8 March, 1941, through 25 April, 1941.
The method of procedure, as disclosed by defendants' records, was that Brown received offers of wagers at the Greensboro place, which were transmitted to race tracks outside the State for "acceptance." If customers were successful, their winnings were transmitted by race track officials to defendants, and defendants paid off the wagers to customers.
The defendants Myers and Crotts were employees of Brown, assisting in carrying on the business. *Page 303 
Brown had a license from the city of Greensboro, under a taxing ordinance upon the use of ticker service or other device for receiving and imparting information concerning games and sporting events, including horse racing, for which he paid the city $300.00.
Upon this verdict, the presiding judge pronounced the defendants guilty as a matter of law upon the facts. C. S., 3180.
From a sentence of imprisonment, suspended upon conditions, the defendants appeal.
The labors of the Court have been lightened by the marked ability with which this case was argued on both sides and the full treatment, in the opposing briefs, of the subject involved.
We have to determine precisely the same question that was presented to the trial judge on the special verdict of the jury: Are the defendants guilty, under the law, upon the facts found in the special verdict? A careful consideration of the facts, pertinent law, and the arguments of counsel, leads us to the conclusion that the answer should be affirmative.
Nevertheless, the defendants have challenged the correctness of this view, as taken by the court below, with arguments which merit serious attention. Counsel contend that the activities carried on at Brown's place of business and participated in by the defendants were not within the purview of the statute for the following reasons: (a) Because the evil which, upon its face, the statute was intended to remedy is the facility which the maintenance of the premises affords for the commission of certain specified criminal acts; and as applied to the defendants, the criminal offense of gambling or betting on a game of chance; and they contend that betting on horse races is not such a criminal offense; (b) because, if betting on horse races should be held a criminal offense, non constat that the defendants are guilty, since the transaction was not at any time completed within this State, nor could be as the business was conducted, and such completion of the betting transaction, as they contend, is contemplated by the statute, and is necessary to the definition of nuisance denounced by it. The defendants further contend that the transactions described in the jury's findings are insufficient to constitute a public nuisance within the common law definition, and could not be so unless the acts of the customers in themselves constituted a crime out of which the nuisance might arise. They also point out that the operations on the premises were carried on without disorder or noise, and did not disturb the peace and quiet of the neighborhood. *Page 304 
Barring the catastrophe of war and the ideologies which engender it, which now overshadow our progress, civilization in English speaking countries has come a long way since the English view of sports, stressed by the defendants as receiving the tolerance of the law, was transplanted to this country. Cock fighting, bear baiting, and goose pulling have gone their way, and gambling at cards and wagering upon games of chance are no longer innocent sports. Defendants contend that betting on horse races is not yet under the ban of the law, although wagering contracts in connection therewith have been outlawed. C. S., 2142. They cite in support of this proposition a number of earlier cases in this State — McKenzie v.Ashe, 2 N.C. 502; Moore v. Simpson, 5 N.C. 34 — and some from other jurisdictions. In reply to this, counsel for the State cite C. S., 2142, supra, and argue that the effect of this statute is to make such betting a criminal offense by declaring it to be unlawful, applying the doctrine asserted in S. v. Pierce, 123 N.C. 745, 747: "The doctrine is well settled that where the statute either makes an act unlawful or imposes a punishment for its commission, such act becomes a crime without any express declaration that it shall be a crime or of its grade." See, also,S. v. Parker, 91 N.C. 650; S. v. Bloodworth, 94 N.C. 918. It is pointed out that it was the intention of the statute to make betting on horse races a criminal offense, since such wagering contracts had already been outlawed and the denouncement of the wager as unlawful came in by amendment at a later time; and also, because section 2143 provides that no person shall be excused from giving testimony concerning such bets and wagers, but that such testimony given under compulsion "shall not be used against him in any criminal prosecution on account of such betting, wagering or staking."
Frequent attempts, some of them successful, to make pari mutuel betting on horse races lawful in certain parts of the State express, at least, the general view that the practice is a violation of the law.
In avoidance of C. S., 4430, which makes it a misdemeanor to "play at any game of chance at which any money, property, or thing of value is bet," or to bet thereon, defendants contend that if horse racing is a game at all, it is not one of chance, but one of skill, and cite S. v. Gupton,30 N.C. 271, 273; S. v. King, 113 N.C. 631; and S. v. Morgan,133 N.C. 743, all of which make a distinction between games of chance and games of skill, holding that the latter are not within the condemnation of the law. S. v. Abbott, 218 N.C. 470, 479, 480, 11 S.E.2d 539. But we apprehend that what is a game of skill to the participants might be only a game of chance to outsiders who bet on the result, since it is the skill of those engaged which decides the issue, and the person who lays the wager may have little information on that point.
We do not agree with the position taken by the defendants that it is essential to the nuisance defined by the statute that the acts of the *Page 305 
customers, which impart that quality to the premises and the business conducted there, should be violations of the criminal law, either generally speaking or under the terms of the statute. It is not necessary that the nuisance declared should have a nucleus of crime essential to its existence. While nuisance is frequently associated with criminal offenses, it is true, and may itself, either at common law or by statute, constitute a violation of the criminal law, as it does in the statute with which we are dealing, the law is not under the necessity of predicating one crime upon another to make valid its denunciation of an act which it denominates a nuisance. Nor will it fail of its purpose because the practices facilitated by the nuisance, so-called, are merely antisocial rather than criminal, and that through suppression of the evil devices of those who promote them, are made the subject of discouragement rather than punishment.
Persons whose conduct or whose enterprise is harmful to the public may be dealt with directly on the theory of nuisance, although the facilities they offer to social misconduct or acts contrary to public policy, or injurious to the welfare of the community, do not amount to open crime. Such a menace to the public welfare, whether directed toward the morals, health, safety, thrift or economy of the community, may afford a reasonable occasion for the exercise of the police power. The social necessity of inhibiting influences and practices detrimental to the public welfare in this sense has extended the theory of nuisance quite beyond the old categories, and has made it a more facile and effective instrument of government, by destroying the external aids, facilities and allurements which increase the offensive practices and multiply those that are engaged therein, and make their concentration an offense to the moral sense of the community where the nuisance exists. We think the present law is based upon this theory.
It is true that the Legislature cannot by mere fiat make that a nuisance which has none of the characteristics of nuisance and which has no tendency "to injure the public health, morals or interests." First Avenue Coal Lumber Co. v. Johnson, 171 Ala. 470, 54 So. 598. But, in the exercise of the police power, it may make new definitions and categories within constitutional limitations, where the evil intended to be reached is noxious to the public welfare and the means employed have a reasonable relation to the result intended to be produced. Calcutt v. McGeachy,213 N.C. 1, 195 S.E. 49.
Within these limitations, the authority of the Legislature to declare a thing to be a nuisance is well recognized. Lawton v. Steele, 152 U.S. 133,38 L.Ed., 385; Los Angeles County v. Spencer, 126 Cal. 670, 59 Pa. 202,385; Fayetteville v. Distributing Co., 216 N.C. 596. Against such legislative action, no person has a vested interest in the common law; and the labels it provides do not necessarily carry with them into the statute common law definitions or implications. About the only *Page 306 
thing that must necessarily persist of the common law conception of nuisance is the noxious quality of the thing in the relation we have mentioned.
Therefore, while we are advertent to the fact that the statute places gambling in parallel construction with other practices that are unquestionably violations of the criminal law, we do not regard this as conclusive that such gambling must be a violation of the law to justify the validity of the statute. Perhaps, the matter we have to decide is not so much whether betting on a horse race is a criminal act as it is to decide whether the making of such a wager may be considered gambling within the meaning of the statute.
Gambling is defined in Century Dictionary: "To play at any game of chance for stakes; hence, in general, to risk money or anything of value on the issue of something involving chance or unknown contingencies (as to gamble on the result of a race; to gamble in stocks)." Gamble is there defined as "the staking or risking of money or anything of value on a matter of chance or uncertainty." Webster defines gamble: "To play or game for money or other stake, as at cards, dice, horce racing, etc." "Game: Sport of any kind."
There is no doubt in our minds that betting on a horse race is within these definitions.
The manner in which the appeal is couched, however, invites a decision upon the question whether betting on a horse race is a violation of the criminal law. That it was the intention, and is the effect, of legislation upon this subject to make it so, we have no doubt.
Reference has already been made to C. S., 2142, which declares such a wager unlawful, and the accompanying statute, C. S., 2143, seems to construe this as making it a violation of the criminal law. See, also, cases cited in this connection. But beyond these implications, we have to deal with C. S., 4430, which provides: "If any person play at any game of chance at which any money, property or other thing of value is bet, whether the same be in stake or not, both those who play and those who bet thereon shall be guilty of a misdemeanor."
As noted above, counsel for the defendants raise the question whether the sport of horse racing could be considered "a game" within the meaning of this statute, and defendants' connection with it, "gaming" or "gambling." The overwhelming weight of authority, following the meaning of terms as used in the criminal law, include horse racing in that category, and it seems to us upon sound reason. "The word `game' is very comprehensive and embraces every contrivance or institution which has for its object to furnish sport, recreation, or amusement. Let a stake be laid on the chance of a game, and we have gaming." In re Opinion of the Justices,73 N. H., 625; quoting definitions from *Page 307 
Webster's Dictionary and Century Dictionary. See People v. Weithaff,51 Mich. 203. "Horce racing is a game, and the betting of money . . . on the result of horse racing is gaming." Swigart v. People, 50 Ill. App, 181,190. "Betting on a horse race is `gaming' and, hence, a room, hall or house where betting on horse races is permitted is a `gaming house.'" Young v.State (Tenn.), 121 S.W.2d 533, 534. " `Gaming' and `gambling' in a criminal sense are synonymous." S. v. Mint Vending Machine Co.,85 N. H., 22. "The terms `gaming' and `gambling' in the administration and interpretation of criminal laws are usually regarded as synonymous." S. v.Shandlin, 51 Wn. 35, 97 Pa., 769, 770. "Betting on races of any kind under pari mutuel scheme is `gambling,' and places devoted to such betting are `nuisances' under the statute." Oak Downs v. Schmid (Tex.Civ.App.),95 S.W.2d 1040.
We are of the opinion that it is the effect of these laws to make betting on horse racing, or, in fact, on any other sort of race, an offense against the criminal law. The fact that the race itself is one of skill and endurance on the part of the jockey and his mount does not confer immunity upon those who wager on its result.
We have carefully examined the case of Lescallet v. Commonwealth,89 Va. 878, 17 S.E. 546, extensively quoted in appellants' brief. We are unable to accept the reasoning in that case as sound, or follow its conclusions. The result in that case was based largely upon the ground that the betting transaction was not completed within the State of Virginia, which, as we understand it, embodies the argument of the defendants in the case at bar. Had the customers who placed the bets been indicted and convicted of gambling, a more serious question might be raised. We think, however, that the fact that the wager was laid here, and a customer notified of its acceptance, and received his winnings, if any, here, constitute sufficient facts to support the charge of maintaining a nuisance, notwithstanding that the formal "acceptance" of the bet appears by custom of the business to have been made at the race track in another state.
We do not regard the fact that the defendant Brown held a tax revenue license under the ordinance of the city of Greensboro, as set out in the statement of facts, material. Such an ordinance could not annul a State law or afford immunity for its violation.
We are reminded that a criminal statute must be strictly construed, and no doubt the statute under review comes within that rule; but in construing it, we must have some regard for the evil that was intended to be remedied, and give the law the force and effect it was intended to have in its incidence upon the defendants and their business. This we have tried to do.
There was no error in the trial in the court below, and the judgment is
Affirmed. *Page 308