STATE OF NORTH CAROLINA v. W. E. FELTON.

(Filed 17 March, 1954.)

**1. Constitutional Law § 10b—**

While every presumption is to be indulged in favor of the constitutionality of a statute, it is the duty of the Court to declare an act unconstitutional when it clearly transgresses the authority vested in the General Assembly by the Constitution.

2. Constitutional Law § 11 (1)—

The General Assembly has the authority, in the exercise of the police power, to enact legislation making gambling a criminal offense.

3. Gambling § 1—

The General Assembly, by the enactment of general statutes has made gambling in its variety of guises and disguises illegal in this State.

4. Same—

The betting on races of any sort is illegal under the general laws of North Carolina. G.S. 16-1, 16-2, and 14-292.

5. Same—

Pari-mutuel machines or appliances, or systems, of the kind employed and used at recognized racing courses, provide a system for betting on the outcome of races.

6. Constitutional Law § 17—

Municipalities and counties may be granted exclusive emoluments or privileges in consideration of public service. Constitution of North Carolina, Article I, Sec. 7.

7. Constitutional Law §§ 17, 18: Gambling § 1—Chapter 541, Session Laws of 1949, held unconstitutional.

Chapter 541, Session Laws of 1949, which provides for the establishment of a racing commission for a single county of the State, with self-perpetuating membership, and which provides that such commission may grant to a single person, firm or corporation a franchise, irrevocable for 25 years, to operate a race track and a system of pari-mutuel betting on dog races, and seeks to legalize pari-mutuel betting on dog races in the county only within the racing course operated by the holder of the franchise, in consideration of the payment of a percentage of the gross receipts, *is held* unconstitutional as being in violation of the Constitution of North Carolina, Article I, Sec. 7, proscribing exclusive or separate emoluments or privileges except in consideration of public services, and Article I, Sec. 31, proscribing monopolies and perpetuities.

8. Same—

The exclusive privilege granted to the holder of a franchise to operate a dog race track under the provisions of Chapter 541, Session Laws of 1949, is not in consideration of public service within the meaning of Article I, Sec. 7, of the Constitution of North Carolina.

9. Same—

The operator of a dog race track under a franchise granted under the provisions of Chapter 541, Session Laws of 1949, is not in effect an employee of the county so as to constitute its operation of the track operation by the county for the county's benefit, since the county's control is limited and its right to participate in the gross revenues is fixed by the statute.

10. Gambling § 7—

The bill of information in this case is held to charge the offense of placing wagers and bets on dog races under the pari-mutuel system by defend-

ant, and defendant's motion to quash on the ground that the bill does not express the charge in a plain, intelligible and explicit manner was properly denied. G.S. 15-153.

APPEAL by State of North Carolina from *Hubbard, Special Judge,* 7 September, 1953, Term of CURRITUCK.

Criminal action wherein the defendant was arrested on a warrant issued from the Recorder's Court of Currituck County under date of 31 August, 1953, upon an affidavit charging in substance the matters alleged in the bill of information referred to below. Upon the call of the case in the Recorder's Court, the defendant demanded a jury trial; and thereupon, in accordance with the applicable statutes, the case was transferred to the Currituck County Superior Court for trial. In the Superior Court, at 7 September, 1953, Term, the defendant and his counsel, in accordance with G.S. 15-140, waived in writing the finding and return into court of a bill of indictment and agreed that the defendant be tried on a bill of information worded as follows:

"BILL OF INFORMATION

"STATE OF NORTH CAROLINA—In the SUPERIOR COURT CURRITUCK COUNTY—September 1953 Term

"Walter W. Cohoon, Solicitor of the First Judicial District, upon information and belief, alleges, that W. E. Felton in Currituck County, State aforesaid, on August 29, 1953, with force and arms, did unlawfully and wilfully place wagers and bets on a game of chance, to-wit: dog races conducted by the Carolina-Virginia Racing Association, Inc., said Association operating under franchise or privilege from the Currituck County Racing Commission pursuant to the provisions of Chapter 541 of the 1949 Session Laws of North Carolina, in which money was bet and wagered, in that the said W. E. Felton did, on the night of the 29th day of August 1953, bet and wager upon the chance and outcome of dog races conducted by the said Association by the purchase of numbered pari-mutuel tickets sold to various and sundry persons and issued by the said Association upon the grounds of said Association, which said Association paid off to the holders of winning tickets in amounts dependent upon the form of the wager on the race and on the position of the dogs at the finish of the race against the form of the Statute in such cases made and provided and against the peace and dignity of the State.

"WALTER W. COHOON,
"*Solicitor.*"

(Counsel representing Currituck County, and other counsel representing the Currituck County Racing Commission, were permitted to appear

as *amici curiae* in the proceedings before Judge Hubbard and also by brief and oral argument in this Court.)

Before pleading, the defendant moved "to quash said Bill of Information for that by reason of Chapter 541, Session Laws of 1949, the bill failed to charge the commission of any crime or misdemeanor." Judge Hubbard allowed the motion to quash, announcing at the time that he was "holding said Act of 1949 to be constitutional." The State of North Carolina duly excepted to this ruling and appealed from the judgment predicated thereon as permitted by G.S. 15-179 (3).

*Attorney-General McMullan, Assistant Attorney-General Moody, and Gerald F. White, Member of Staff, for the State.*

*E. R. Woodard for defendant, appellee.*

*Lucas, Rand & Rose, John B. McMullan, Wilton F. Walker, Jr., and John G. Dawson as amici curiae.*

BOBBITT, J. As stated in the brief filed here by counsel appearing as *amici curiae:* "Thus it is seen that the case has come to this Court in such form as to test the constitutionality of the aforesaid Chapter 541 of the Session Laws of 1949. That is the single question involved."

In undertaking our task of decision, we are mindful that "in considering the constitutionality of a statute, every presumption is to be indulged in favor of its validity." *Stacy, C. J.,* in *S. v. Lueders,* 214 N.C. 558 (561), 200 S.E. 22. We are mindful also that "when it is clear a statute transgresses the authority vested in the Legislature by the Constitution, it is a duty of the Court to declare the act unconstitutional." *Parker, J.,* in *Wilson v. High Point,* 238 N.C. 14 (23), 76 S.E. 2d 546.

A better perspective as to the applicable principles of law may be obtained by an analysis of the statute here under consideration, to wit, Ch. 541, 1949 Session Laws of North Carolina, entitled, "AN ACT CREATING THE CURRITUCK COUNTY RACING COMMISSION FOR THE COUNTY OF CURRITUCK IN THE STATE OF NORTH CAROLINA AND PROVIDING FOR AN ELECTION THEREON," hereinafter referred to as the 1949 Currituck Act.

Section 1 creates the Currituck County Racing Commission, consisting of three members. The original members are to be appointed by the Member of the House of Representatives from Currituck County, for one, two and three years, respectively; and at the expiration of the first term of each member his successor is to be appointed for a term of four years by the Member of the House of Representatives from Currituck County *and* the two members whose terms have not expired, and so consecutively thereafter. Any vacancy shall be filled by the Member of the House of Representatives from Currituck County *and* the remaining members of the Commission. The salary of each commissioner is to be fixed by a

committee of three, consisting of the Chairman of the Commission, the Chairman of the Board of County Commissioners and the Chairman of the Board of Education. A vote of any two of the three shall control. The Commission is directed to organize, elect a chairman, a vice-chairman and a secretary-treasurer. The secretary-treasurer is required to give a $5,000.00 bond and to receive . . . disburse . . . the money of the Commission "by authority of the commission" and "under the provisions of this Act."

Section 2 vests in the Commission full authority "to grant to any person, firm, association, or corporation a franchise or privilege, franchises or privileges, for a term of years not exceeding twenty-five years, to construct, lease, maintain, operate, and own, or to exercise either of said privileges, a race course or driving park or appropriate facilities for pacing, running, and trotting races for horses or dogs, or for both horses and dogs, in the manner herein set forth." Section 2 (a) provides that no franchise or privilege shall be granted unless and until the Commission is satisfied as to the financial ability and responsibility of "such person, firm, association, or corporation to comply with all the reasonable rules and regulations of the commission and to otherwise operate in accordance with such reasonable rules and regulations as the commission may from time to time prescribe." Section 2 (b) provides that the holder of such franchise or privilege shall pay to the Commission "for each day or part of day during which races or racing is conducted a sum equivalent to ten per cent (10%) of the gross receipts derived from *all* sources or operations connected with or incident to the operation of such races or racing conducted during such day or part of day." The maximum payment to be required is $5,000.00 per day, "in addition to any tax as may be now or hereafter fixed by law on such gross receipts."

Section 3 provides that the net proceeds of the Commission's operations shall be disbursed by it as follows: 50% to the Currituck County School Fund; 25% to the Currituck County Welfare Fund; and 25% to the Currituck County General Fund.

Section 4 provides that under a franchise or privilege so granted, the holder thereof is fully authorized to acquire property, construct facilities, etc., for "pacing, running, and trotting races for horses or dogs, or for both horses and dogs, on property owned or leased" by it. Then follows the provision which provoked the controversy, to wit: "Such person, firm, association, or corporation is hereby expressly granted full authority and power to own or lease, maintain, and operate on the premises aforesaid what are generally known as 'Pari Mutuel Machines or Appliances' or 'Pari Mutuel Systems' of the kind employed and in use at recognized racing courses in America: *Provided, however,* that said Pari Mutuel Machines and Appliances, or Pari Mutuel Systems, shall be operated only

within the enclosure of said race course or driving park or appropriate facilities for the aforesaid operations and only on days or parts of days when races or racing is being therein conducted. And it shall be legal for any and all persons twenty-one (21) years of age legally within the enclosure aforesaid to participate in the operation of or become a patron of said Pari Mutuel Machines and Appliances, or Pari Mutuel Systems."

Section 4 (a) provides that so long as the holder of the franchise, etc., complies with "the reasonable terms and provisions" thereof and "with such other reasonable rules and regulations as the said commission may promulgate from time to time and as may be set forth in its contracts," the franchise is irrevocable; *"Provided, however,* that no franchise granted to any person, firm, association, or corporation by said commission shall be assigned or transferred to any other person, firm, association, or corporation without the written consent of the commission; *nor shall the commission grant a franchise or privilege to more than one person, firm, association, or corporation, it being the intention and purpose that the operations shall be under a single management."* (Emphasis added.)

Section 5 provides that the Commission is authorized to adopt reasonable rules and regulations from time to time which it may "deem necessary to properly carry out the intentions of this Act." The violation thereof by the holder of the franchise or by any of its officers, agents or employees is declared to be a misdemeanor.

Section 6 provides that the Board of Commissioners of Currituck County shall order a special election, at which the qualified voters of Currituck County shall vote "For" or "Against" creating the Currituck County Racing Commission. The Act shall be in full force and effect if the majority of the qualified voters who vote at such election shall vote in favor of creating the Currituck County Racing Commission; otherwise, the Act shall not be in effect. However, should the voters fail to vote in favor of the creation of the Commission, other elections may be called by the Board of County Commissioners, successively, but not until six (6) months from the preceding election have expired; and if at any subsequent election so called and held, "a majority of the qualified voters who vote at said election shall vote in favor of establishing the Currituck County Racing Commission, then and in such event this Act shall be in full force and effect."

Section 7 provides that "All laws and clauses of laws in conflict with this Act are hereby repealed."

Section 8 provides that "This Act shall be in full force and effect from and after its ratification." It was ratified 25 March, 1949.

The Bill of Information alleges explicitly that the betting on dog races in which the defendant participated was the pari-mutuel system conducted

by the Carolina-Virginia Racing Association, Inc., under franchise from the Currituck County Racing Commission, pursuant to the provisions of the 1949 Currituck Act. The defendant's position is that the franchise granted to the Carolina-Virginia Racing Association, Inc., pursuant to the statute under consideration, authorizes it to operate a pari-mutuel system of betting on dog races at its dog race track; therefore, one who gambles at such dog race track by participating in such legalized pari-mutuel system is not guilty of a criminal offense under the general laws of North Carolina relating to gambling.

While gambling *per se* is not a crime at common law, the General Assembly, in the exercise of the police power, can enact legislation making gambling a criminal offense. A general statement bearing upon this subject is set forth in 24 Am. Jur. 399 (Gaming and Prize Contests, Sec. 3), viz.:

"3. Generally.—It is well settled that the police power of the state may be exerted to preserve and protect the public morals. It may regulate or prohibit any practice or business the tendency of which, as shown by experience, is to weaken or corrupt the morals of those who follow it or to encourage idleness instead of habits of industry. Whether gambling, in the various modes in which it is practiced, is demoralizing in its tendencies and, therefore, an evil which the law may rightfully suppress without interfering with any of those inherent rights of citizenship which it is the object of government to protect and secure is no longer an open question. Gambling is injurious to the morals and welfare of the people, *and it is not only within the scope of the state's police power to suppress gambling in all its forms, but its duty to do so.* In enacting legislation for this purpose, there is no invasion of constitutional rights, unless the restraints imposed are unreasonable. The courts are not concerned with the necessity for, or the wisdom of, a legislative enactment forbidding gaming transactions and wagers, provided it is a valid exercise of the police power." (Emphasis added.)

If this be a duty, the General Assembly, which largely controls the public policy of the State, has performed such duty well by the enactment of general statutes on the subject of gambling in its variety of guises and disguises, *e.g.,* lotteries, punch boards, slot machines, betting on games of chance; and the violation of such a statute is a misdemeanor. Art. 37, Ch. 14, of the General Statutes. Construing the statutes presently designated G.S. 16-1, G.S. 16-2, and G.S. 14-292, it was directly held in *S. v. Brown,* 221 N.C. 301, 20 S.E. 2d 286, that "betting on horse racing, or, in fact, on any other sort of race," is an offense against the criminal law; and there the defendants were found guilty of maintaining a nuisance by using premises for the purposes of handling bets and wagers on the out-

come of horse races run outside of North Carolina. What is said by *Seawell, J.,* in *S. v. Brown, supra,* is equally applicable to dog races.

The statute under consideration purports to authorize the grant of a franchise for the maintenance and operation on the dog race track premises what are generally known as "Pari Mutuel Machines or Appliances" or "Pari Mutuel Systems" of the kind employed and in use at recognized racing courses in America; *provided, however,* that said Pari Mutuel Machines and Appliances, or Pari Mutuel Systems, shall be operated only within the enclosure of said race course and only on days or parts of days when races are being conducted. It will be observed that the statute does not speak of "betting" or "wagering" or "gambling." Therefore, unless "Pari Mutuel Machines or Appliances" or "Pari Mutuel Systems" of the kind employed and in use at recognized racing courses in America *ex vi termini* constitute a scheme or system whereby the participants place bets on the outcome of the races in a manner such as to constitute gambling under the general laws the 1949 Currituck Act affords no color of protection whatever to the Carolina-Virginia Racing Association, Inc., or to the defendant. We accept the view, upon which the defendant must rely, that a pari-mutuel system is well recognized as a system having no other purpose than that of providing the facilities by means of tickets, machines, etc., for placing bets, calculating odds, determining winnings, if any, whereby participants bet on the outcome of the races. *S. v. Ar-Sar-Ben Exposition Co.,* 118 Neb. 851, 226 N.W. 705; *Pompano Horse Club v. State,* 93 Fla. 415, 111 So. 801, 52 A.L.R. 51; *Donovan v. Eastern Racing Asso.,* 324 Mass. 393, 86 N.E. 2d 903 (906); *City of Portland v. Duntley,* 185 Or. 365, 203 P. 2d 640 (644); *Feeney v. Eastern Racing Asso., Inc.,* 303 Mass. 602, 22 N.E. 2d 259; *Wise v. Delaware Steeplechase & Race Asso.,* 18 A. 2d 419 (Del.); *Utah State Fair Asso. v. Green,* 68 Utah 251, 249 P. 1016 (1028).

In *City of Portland v. Duntley, supra,* we find this succinct, but comprehensive, descriptive statement of a pari-mutuel system: "The wagering system termed in the statute 'mutual' or 'mutuel' is what is commonly known as the 'pari mutuel' system, under which 'odds' are determined by the *quantum* of the bets placed on the several entries and those whose wagers are placed on the winning horse share the total stake, less a fixed percentage to the track management, in proportion to their respective contributions or wagers."

In our view the constitutionality of the 1949 Currituck Act must be considered in relation to these provisions of our fundamental law, set out under the caption "Declaration of Rights," of the Constitution of North Carolina, viz.:

Article I, Section 7, which provides: "Exclusive emoluments, etc.—No man or set of men are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services."

Article I, Section 31, which provides: "Perpetuities, etc.—Perpetuities and monopolies are contrary to the genius of a free state and ought not be allowed."

In *S. v. Fowler,* 193 N.C. 290, 136 S.E. 709, the defendant was indicted and convicted in Polk County under the general criminal statutes of the State relating to the possession of intoxicating liquor and was sentenced to imprisonment under such statutes. He appealed on the ground that, while the sentence was authorized by the general criminal statutes on the subject, a public-local act, applicable only to Polk and four other named counties, provided that upon conviction for the first offense the maximum punishment was a fine of $100.00. In holding that the public-local act was in violation of Art. I, sec. 7, and in sustaining the sentence under the general criminal statutes, the Court, speaking through *Justice Adams,* said: "There are constitutions which provide in express terms that general laws shall have a uniform operation; ours embodies the principle in the following language: 'No man or set of men are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services.' Const., Art. I, sec. 7. This provision, we think, is a guaranty that every valid enactment of a general law applicable to the whole State shall operate uniformly upon persons and property, giving to all under like circumstances equal protection and security and neither laying burdens nor conferring privileges upon any person that are not laid or conferred upon others under the same circumstances or conditions. 6 R.C.L. 369, sec. 364; 36 Cyc. 992; 12 C.J. 1187, sec. 955; 16 C.J. 1352, sec. 3189; *S. v. Bargus,* 53 A.S.R. (Ohio) 628; *Jones v. R. R.,* 121 A.S.R. (Ill.) 313; Cooley's Const. Lim., 554 *et seq.*"

By way of answer to the contention that this was a valid exercise of the police power of the State, *Justice Adams* said: "But the statute under consideration cannot be sustained on the ground that it was enacted in the exercise of the police power. The question is whether it shall supersede 'the law of the land,'—the general public law which was designed to operate without exception or partiality throughout the State. It is needful to remember that the indictment was drafted under the general law, and that the decisive question is whether offenders in the five counties referred to may lawfully be exempted from the punishment prescribed by the general law; whether they shall be subject only to a fine when the offenders in ninety-five other counties may be punished by imprisonment. In our judgment this part of Section 2 is neither equal protection of the laws nor the protection of equal laws (*Connolly v. Pipe Co., supra*); it is the grant of a special exemption from punishment or an exclusive or separate privilege which is forbidden by the cited provision. This conclusion is upheld in principle in our own decisions and in those of other jurisdictions."

In *Plott v. Ferguson,* 202 N.C. 446, 163 S.E. 688, an act relating only to Buncombe County and providing that certain provisions should be deemed written into private construction contract bonds executed in that county by corporate sureties different from those required by the general laws relating to the subject, was held unconstitutional on the ground that it conferred special privileges on residents of Buncombe County and imposed on corporate sureties in respect of such bonds executed there obligations not imposed in other counties or on individuals. In *Plott v. Ferguson, supra,* the Court expressly followed the reasoning in *S. v. Fowler, supra,* particularly in relation to Art. I, Sec. 7. In the opinion of *Clarkson, J.,* in *Plott v. Ferguson, supra,* we note the following: "In 6 R.C.L., part sec. 437, at p. 441-2, the law is thus stated: 'Due process of law and the equivalent phrase, law of the land, have frequently been defined to mean a general and public law operating equally on all persons in like circumstances, and not a partial or private law affecting the rights of a particular individual or class of individuals, in a way in which the same rights of other persons are not affected.'

"Cooley's Const. Lim., Vol. 1, note, under Powers Legislative Department May Exercise, p. 261: 'Gambling cannot be made a crime everywhere except "within the limits or enclosure of a regular race course." *S. v. Walsh,* 136 Mo. 400, 37 S.W. 1112, 35 L.R.A. 231; see, also, *S. v. Elizabeth,* 56 N.J.L., 28 Atl. 51, 23 L.R.A. 525.' "

These cases, *S. v. Fowler, supra,* and *Plott v. Ferguson, supra,* are cited with approval in later cases, including *Hendrix v. R. R.,* 202 N.C. 579, 163 S.E. 752; *Edgerton v. Hood,* 205 N.C. 816, 172 S.E. 481; *S. v. Harris,* 216 N.C. 746, 6 S.E. 2d 854; *S. v. Glidden Co.,* 228 N.C. 664, 46 S.E. 2d 860; *Duncan v. Charlotte,* 234 N.C. 86, 66 S.E. 2d 22.

The defendant cites as in conflict with *S. v. Fowler, supra,* and decisions based thereon, certain earlier decisions, including *S. v. Muse,* 20 N.C. 463; *S. v. Joyner,* 81 N.C. 534; *S. v. Stovall,* 103 N.C. 416, 8 S.E. 900; *S. v. Moore,* 104 N.C. 714, 10 S.E. 143; *S. v. Barringer,* 110 N.C. 525, 14 S.E. 781; *S. v. Barrett,* 138 N.C. 630, 50 S.E. 506; *Brunswick-Balke-Collender Co. v. Mecklenburg County,* 181 N.C. 386, 107 S.E. 317.

We have not overlooked the decision of the Supreme Court of the United States, decided 11 January, 1954, in *Salsbury v. Maryland,* 346 U.S. 545, 98 L. Ed. (Advance p. 207), 74 S. Ct. 280, involving a Maryland statute authorizing the admission in prosecutions for gambling misdemeanors in certain named counties of evidence illegally obtained, *i.e.,* without a search warrant, when such evidence was inadmissible under general state law in the other counties of the state. The Court rejected the defendant's claim that distinction based on county areas are necessarily so unreasonable as to deprive him of the equal protection of the laws guaranteed by the Federal Constitution. It was stated by *Mr. Jus-*

*tice Burton:* "The Equal Protection Clause relates to equality between persons as such rather than between areas." Hence, *so far as the Equal Protection Clause of the Federal Constitution* was concerned, it was held permissible for the General Assembly of Maryland, being authorized to do so under the Maryand Constitution, to enact such local legislation.

It would seem that *S. v. Fowler, supra,* and *Plott v. Ferguson, supra,* would constitute ample authority for a decision that the 1949 Currituck Act is unconstitutional. However, in view of the earlier decisions cited by defendant as being in conflict and noted above, it is urged that the decisions in *S. v. Fowler, supra,* and *Plott v. Ferguson, supra,* should be reconsidered. There appears to be no necessity for doing so in relation to the statute now under consideration.

It should be noted that grants of well-defined monopolistic rights to regulated *quasi*-public utilities, including the power of eminent domain, under the public law, are upheld as being "in consideration of public service" within the terms of Art. I, sec. 7, of the Constitution of North Carolina. Indeed, such corporations have become known as "public service corporations." *Utilities Com. v. State* and *Utilities Com. v. Telegraph Co., ante,* 333, 343, 80 S.E. 2d 133; *Power Co. v. Power Co.,* 175 N.C. 668, 96 S.E. 99; *Reid v. R. R.,* 162 N.C. 355, 78 S.E. 306; *In re Spease Ferry,* 138 N.C. 219, 50 S.E. 625. Within the exception, *a fortiori,* is a municipal corporation, an agency of the State, created for the benefit of the public. *Kornegay v. Goldsboro,* 180 N.C. 441, 451, 105 S.E. 187.

It should be noted that it has been held consistently that acts of the General Assembly giving special privileges to private corporations by way of charter provisions or otherwise violate the provisions of Art. I, sec. 7. *Motley v. Finishing Co.,* 124 N.C. 232, 32 S.E. 555; *Motley v. Warehouse Co.,* 122 N.C. 347, 30 S.E. 3; *Meroney v. Building & Loan Asso.,* 116 N.C. 882, 21 S.E. 924; *Rowland v. Building & Loan Asso.,* 116 N.C. 877, 22 S.E. 8; *Staton v. R. R.,* 111 N.C. 278, 16 S.E. 181; *Simonton v. Lanier,* 71 N.C. 498. See also, *Edgerton v. Hood, supra,* and *Cowan v. Trust Co.,* 211 N.C. 18, 188 S.E. 812.

Counsel appearing *amici curiae,* with prodigious research and great learning, have brought to our attention the historical background and origin of the language of Art. I, sec. 7, and contend persuasively that a county is a subdivision of the State and is not "a man or set of men" within the meaning of Art. I, sec. 7. However, the 1949 Currituck Act, as pointed out below, confers special privileges upon a private corporation, not upon Currituck County as a political subdivision of the State. Upon close scrutiny of the 1949 Currituck Act, we find:

1. Under Section 1, after the original three members of the Commission are appointed by the Member of the House of Representatives from Currituck County, all later appointments are to be made by the Member

of the House of Representatives from Currituck County *and* the two members of the Commission whose terms have not expired, making apparent the possibility of self-perpetuating membership on the Commission.

2. Under Section 6, provision is made for an original and, if necessary, successive elections, at intervals of six months, for the purpose of voting the Act "in" without any provision whatever, once it becomes effective, for an election for the purpose of voting the Act "out."

3. The franchise granted by the Commission to Carolina-Virginia Racing Association, Inc., is irrevocable, for a period of twenty-five years, except for failure to pay 10% of its gross receipts from *all* its operations and for failure to comply with "the reasonable rules and regulations of the Commission." To what subjects do such rules and regulations relate? Do they concern the percentage the Carolina-Virginia Racing Commission, Inc., is to be allowed to deduct from the money bet on the races as its charge, commission or fee for operating the pari-mutuel gambling establishment? Do they relate to the price of admission to the race track grounds? Do they relate to the conduct of patrons? Do they relate to the manner in which the races are run? It is interesting to notice that Section 5 provides that the violation of the rules and regulations *by the holder of the franchise or by any of its officers, agents or employees* is declared to be a misdemeanor. What kind of misdemeanor could they and they alone commit? Are there any standards whatever for the so-called reasonable rules and regulations? It may be doubted that such rules and regulations, in the absence of statutory standards, would have any validity whatever. *Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310, and cases cited.

4. The language of the statute has the plain meaning, confirmed by the prompt award of the franchise, that such franchise is to be granted only to one private "person, firm, association or corporation"; and the proviso in Section 4 states, in express terms: *"nor shall the commission grant a franchise or privilege to more than one person, firm, association, or corporation, it being the intention and purpose that the operations shall be under a single management."*

5. The separate, exclusive privileges are not granted to Currituck County as a political subdivision of the State but under a twenty-five year irrevocable franchise to one private corporation, which has bought this separate, exclusive privilege, not available to any other person, firm, association or corporation of Currituck County or elsewhere in North Carolina.

6. The general statute law as to gambling continues to apply in Currituck County. The 1949 Currituck Act does not purport to legalize a particular type of gambling, *i.e.,* betting on dog or horse races in Curri-

tuck County. Only the Carolina-Virginia Racing Association, Inc., and its patrons, may violate the general criminal laws of the State relating to gambling. Furthermore, betting on the Currituck dog races may not be done legally by Currituck County residents or other residents of North Carolina except on the race track premises in Currituck County.

We have examined the decisions from other jurisdictions brought to our attention. Suffice it to say that none involves the constitutionality of a statute containing provisions analogous to the 1949 Currituck Act.

Solely to clarify the question before us, and without intimating decision on questions *not* before us, we observe:

1. The question is not whether the General Assembly can enact a statute legalizing gambling in a single county, applicable alike to all persons within the county.

2. The question is not whether the General Assembly can enact a statute legalizing a particular type of gambling in a single county, applicable alike to all persons within the county.

3. The question is not whether the General Assembly can enact a statute authorizing the governing board of a county or other governmental unit or agency to operate either on a State-wide basis, or within a county or other restricted portion of the State, a system of pari-mutuel betting on dog races, lotteries, or other types of gambling.

The one question before us is whether a statute that authorizes a commission, with provisions making possible a self-perpetuating membership, to grant, in consideration of a percentage of the gross receipts, an exclusive franchise irrevocable for a period of twenty-five years to a private corporation to operate in Currituck County a system of pari-mutuel betting on dog races, exceeds the constitutional power of the General Assembly.

We must conclude that the 1949 Currituck Act violates Art. I, sec. 7, and Art. I, sec. 31, of the Constitution of North Carolina. It is in conflict with that fundamental democratic principle: "Equal rights and opportunities to all, special privileges to none."

The 1949 Currituck Act presents the same situation as would exist if the General Assembly were to attempt, directly or indirectly, to grant to a private person, firm, association or corporation in one of the more populous counties, *e.g.,* Mecklenburg, Guilford, Forsyth or Wake, the exclusive right to operate a lottery where persons could legally participate on the licensee's premises, in consideration of the payment by such licensee of a percentage of its gross receipts to the county for use for county purposes.

We state without elaboration that the special, exclusive privileges granted to this private corporation under the 1949 Currituck Act are not "in consideration of public services" within the meaning of Art. I, sec. 7.

We assume that the taxpayers of Currituck County have reaped *financial* benefits from the operation of the pari-mutuel gambling establishment, operated as a feature if not *the* feature, of the race track. No doubt more money has been available for county purposes and less taxes have been required. It is not unusual that a monopoly should yield large returns. The franchise holder pays 10% of gross receipts for his privileges with a maximum of $5,000.00 for any one day. This goes to the County, after deduction has been made for the salaries and other expenses of the Commission. It would seem that this rather unimpressive fraction of gross revenue is little enough to pay for such special privileges. The lure of "easy money" makes a strong appeal. But the lure of "easy money" is not calculated to build the moral fiber of the citizenship of Currituck County. The incentive to achievement by working rather than by possibility of winning without working is the basis for stability, self-reliance and character.

Counsel appearing as *amici curiae* suggest that the Carolina-Virginia Racing Association, Inc., is virtually an employee of the county, operating the establishment primarily for the county's benefit. We cannot accept this view. The county's right to participate in the gross revenues is fixed and limited by statute. Beyond this statutory percentage, the private franchise holder is on its own. We forego a discussion in detail of the interesting suggestion as to the employer-employee, master-servant, relationship. Suffice it to say that one of the evil and demoralizing influences of organized gambling, legalized or unlawful, is its insidious tendency to infiltrate and to control those agencies of government charged with the duty either of controlling or of suppressing its operations. When revenues from gambling operations become a substantial part of the public revenues of a county, the task of cutting loose requires a major and difficult operation. No idea of controlling gambling is apparent from a reading of the 1949 Currituck Act. The reverse is true. The more extensive the gambling operations become, the greater the revenues to Currituck County and the greater the revenues to the holder of the franchise. Neither an individual nor a community can gamble his or its way to an enduring prosperity.

Counsel appearing as *amici curiae,* while devoting their argument principally to the constitutional question, make the point that the bill of information was properly quashed because it did not express the charge against the defendant in a plain, intelligible and explicit manner as required by G.S. 15-153. We think the bill of information charges in plain and unmistakable terms that the defendant and others on the date alleged unlawfully and willfully bet and wagered on dog races under the pari-mutuel system of betting and wagering operated by the Carolina-Virginia

Racing Association, Inc., under its franchise granted pursuant to the 1949 Currituck Act.

For the reasons stated the defendant's motion to quash should have been overruled. Accordingly, the judgment of the lower court is

Reversed.