STATE OF NORTH CAROLINA ON THE RELATION OF WILEY H. TAYLOR, JR., v. CAROLINA RACING ASSOCIATION, INC., THE TOWN OF MOREHEAD CITY, AND THE MOREHEAD CITY RACING COMMISSION.

(Filed 10 November, 1954.)

**1. Constitutional Law § 25—**

A contract imposes no binding obligations if its validity is dependent upon the provisions of an unconstitutional statute. Constitution of the United States, Art. I, sec. 10.

**2. Same—**

The Federal Constitutional protection of the obligations of contracts against state action is directed only against impairment by legislation and not by judgments of courts. Constitution of the United States, Art. I, sec. 10.

**3. Nuisances § 6b: Injunctions § 4d: Constitutional Law § 20a—**

G.S. 19-1 *et seq.*, defining public nuisances and providing for the abatement of such nuisances by the closing of the premises for one year, unless sooner released, and the sale of the personal property seized in the absence of bond by defendant, and the distribution of the proceeds of such sale, is constitutional.

**4. Injunctions § 4j: Public Officers § 9—**

The rule that acts performed by a public officer or agency under color of legislative authority may not be enjoined as a statutory nuisance under G.S. 19-1, *ct seq.*, on the ground of the alleged unconstitutionality of the legislation, does not apply to such injunction against the acts of a private person, firm, association, or corporation.

**5. Gambling § 1: Injunctions § 4d—**

Betting on dog races under a pari-mutuel system having no other purpose than that of providing the facilities for placing bets, calculating odds, determining winnings, if any, constitutes gambling, and is subject to abatement by injunction as a statutory nuisance, G.S. 19-1 *et seq.*, unless specifically permitted by constitutional statute.

**6. Constitutional Law §§ 17, 18—**

Construing Chapter 540, Public-Local and Private Laws of 1939, *it is held* that the act contemplates there shall be only one franchise and licensee at a time for the operation of the race track thereunder, and therefore, the act is unconstitutional as being in violation of Article I, Section 7, and Article I, Section 31, of the Constitution of North Carolina.

**7. Constitutional Law § 11—**

The police power of the state is as extensive as may be required for the protection of the public health, safety, morals, and general welfare.

**8. Constitutional Law § 14—**

The General Assembly may prohibit or regulate gambling in the exercise of the police power.

**9. Same—**

The police power may not be exercised to grant privilege or immunity to particular persons, or to persons in a particular locality, to violate general statutory laws condemning gambling and proscribing the operation of gambling establishments.

**10. Constitutional Law § 17—**

The exclusive privilege granted to the holder of a franchise under Chapter 540, Public-Local and Private Laws of 1939, to operate a dog race track is not in consideration of public service within the meaning of Article I, Section 7, of the Constitution of North Carolina, notwithstanding that a municipality receives a fraction of the gross receipts of such operation.

**11. Constitutional Law § 8c—**

The General Assembly may not delegate to qualified voters of one governmental unit, *e.g.*, a town, the power to decide whether a statute shall be in force and effect in a territory outside the limits of such governmental unit.

**12. Same—**

Legislative power rests exclusively in the General Assembly, and may not be delegated except as authorized by the Constitution. Constitution of North Carolina, Article II.

**13. Statutes § 2—**

Chapter 540, Public-Local and Private Laws of 1939, which provides for the operation of a pari-mutuel dog racing track by the licensee of the Racing Commission *is held* a local and special act relating to trade, and is unconstitutional. Constitution of North Carolina, Article II, Section 29.

APPEAL by defendant from *Williams, J.,* June Term, 1954, of CARTERET.

This is a civil action brought in the name of the State of North Carolina, on relation of Wiley H. Taylor, Jr., a citizen and resident of Carteret County, against the defendant Carolina Racing Association, Inc., a private corporation, under the provisions of Ch. 19 of the General Statutes of North Carolina, entitled "Offenses against Public Morals," to perpetually enjoin, as a nuisance as defined by G.S. 9-1, the defendant's maintenance and use of certain premises, buildings, fixtures and machines, for the purpose of gambling.

The defendant was ordered to show cause why such writ of injunction should not issue. The Town of Morehead City and the Morehead City Racing Commission, upon their separate applications, were made parties defendant and granted leave to file answers.

Upon the pleadings, affidavits and documents before Judge Williams at the hearing, these facts appear:

Pursuant to an Act of the General Assembly of North Carolina entitled, "An Act Creating the Morehead City Racing Commission for the Town of Morehead City in the State of North Carolina and Providing for an Election Thereon," Ch. 540, Public-Local and Private Laws of 1939, hereinafter called the Morehead City Act, an election was held at which a majority of the qualified voters of the town declared themselves in favor of the Act and of the creation of the Racing Commission provided for therein. (While it is not expressly stated in the pleadings or affidavits, we assume that the members of the Racing Commission were appointed as provided in the Act.)

On 15 July, 1947, the Commission adopted a resolution granting to the Racing Association, Inc., hereinafter called defendant, (Section 1) "a franchise, right and privilege for a term of ten (10) years from the date hereof to lease from the Town of Morehead City outside the corporate limits thereof, but within the limits of Carteret County, on property leased by the Town of Morehead City, and to construct, operate and maintain a race course or driving park for trotting, pacing and running races for horses and dogs, and to operate and maintain what is generally known as 'Pari-Mutuel machines or appliances' of the kind generally employed and in general use at racing courses in America; provided, however, that said Pari-Mutuel machines and appliances shall only be maintained and

operated within the enclosure of said park, driving grounds or race course, and only on days or parts of days when races or racing is being therein conducted." The annual rental for the grounds (Section 2), is one ($1.00) dollar. The franchise so granted (Section 5) is irrevocable for such ten-year period so long as the defendant complies with the terms thereof and with the rules and regulations promulgated from time to time by the Commission. It is granted (Section 3) upon terms such that the defendant is required to pay to the Commission "for each day or part of day during which races or racing is conducted a sum equivalent to ten per cent (10%) of the gross receipts derived from all sources or operations connected with or incident to the operation of such races or racing conducted during such day or part of day." The term "sum equivalent to ten per cent (10%) of the gross receipts derived from all sources or operations" shall mean "(a) ten per cent (10%) of the first monies received by the holder of this franchise, derived from the operations of the Pari-Mutuel machines, after the direct return to the bettors shall have been made; (b) ten per cent (10%) of all admissions to the enclosure; . . ." The defendant (Section 7) cannot transfer or assign the franchise to any other person, firm, association or corporation without first obtaining the written consent of the Commission.

Other provisions of the franchise need not be stated, there being no contention that the defendant has breached any of its terms and conditions.

The defendant acquired a tract of land in Carteret County, located approximately four miles west of the Town of Morehead City, and constructed thereon, at a total cost of approximately $300,000.00, a race course intended for and suitable for the racing of dogs, and conducted during the years 1948-1953, both inclusive, on said premises, at stated intervals, dog races, in connection with which it installed and maintained, for the use of persons who chose to patronize them in betting on the races, the "pari-mutuel" system and apparati used in connection therewith of the kind employed and used at recognized race courses in America.

During the years 1948-1953, both inclusive, out of revenues received from the operation of the dog-racing track and the "pari-mutuel" system of betting on the races, the defendant has paid to the Town of Morehead City, through the Commission, the following amounts: 1948—$26,000.00; 1949—$26,500.00; 1950—$33,000.00; 1951—$18,250.00; 1952—$28,-000.00; 1953—$38,500.00. These amounts represent ten per cent (10%) of the gross receipts less the salaries and expenses of the Commission. The defendant, for the 1953 season, had a payroll of $107,887.54, exclusive of salaries to its officers, and paid out in purses, that is, to the owners of dogs participating in the races, the sum of $63,389.00, and had total operating expenses of $333,823.36. There being no statement as to the

salaries and expenses of the Commission for the 1953 season, it does not appear to what extent the 1953 operations were profitable to the defendant.

The amounts received by the Town of Morehead City have enabled the municipality, without increasing its tax levy, to purchase new fire-fighting equipment, pave and improve streets, purchase a police radio system and other police equipment, increase the salaries of policemen, make improvements to the municipal hospital, purchase additional equipment for grading streets and the collection and disposal of garbage; and, in short, have been generally advantageous to its fiscal position.

Having acquired a tract of land in Carteret County, outside the corporate limits of Morehead City, the defendant, on or about 15 July, 1947, leased it to said town, which in turn leased it to defendant, each lease being for the term of ten years and each providing that the lessee pay, in advance, a rental of one dollar ($1.00) per year. Under each lease, the defendant was required to pay all taxes and other assessments against the property.

The defendants' pleadings and affidavits are to the effect that the operations of the race track and pari-mutuel system have enabled a large number of Carteret County residents as well as others to obtain employment, that they have been conducted in an orderly and proper manner, and that the Town of Morehead City and the adjoining area in and about Carteret County have been greatly benefited thereby. Further, the defendant alleges that its stockholders, both within and without North Carolina, have invested large sums of money in reliance upon the Morehead City Act and the franchise granted in conformity therewith.

Upon the facts disclosed by the defendants' pleadings, affidavits and pleaded documents, the court below held that the operation of the pari-mutuel machines in connection with the dog races constituted the maintenance of an establishment for the purpose of gambling within the purview of G.S. 19-1 *et seq.*, and that Ch. 540, Public-Local Laws of 1939, as amended by Ch. 75, Public-Local Laws of 1941, and Ch. 616, Session Laws of 1949, is unconstitutional. Thereupon, judgment was entered restraining and enjoining the defendant (Racing Association, Inc.), its servants, agents and employees, from continuing, maintaining and using the premises as a place of business, and restraining and enjoining the removal of furniture, fixtures, etc., therefrom, and ordering the Sheriff of Carteret County to take and retain possession of the premises and of all personal property therein pending the further orders of the court.

The defendants excepted to the foregoing judgment and appealed to this Court. The assignments of error, briefly stated, are as follows:

1. That the court erred in its ruling, and in predicating judgment thereon, that the Morehead City Act is unconstitutional and therefore void.

2. That the court erred in rendering judgment providing for the seizure of defendant's property and the restraint of its business, this constituting an impairment of the contract between the Commission and the defendant in violation of Art. I, Sec. 10, of the Constitution of the United States.

3. That the court erred in rendering judgment whereby the defendant's investment was made practically worthless, thereby depriving the defendant of its property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States.

4. That Ch. 19 of the General Statutes of North Carolina under which judgment was entered, is violative of the Fourteenth Amendment to the Constitution of the United States in that it deprives the defendant of its property without due process of law and denies to the defendant the equal protection of the law.

*Frank B. Aycock, Jr., for plaintiff relator, appellee.*

*John G. Dawson and Lucas, Rand & Rose for Carolina Racing Association, Inc., defendant, appellant.*

*George H. McNeil for defendant Morehead City, appellant.*

*Harvey Hamilton, Jr., for defendant Morehead City Racing Commission, appellant.*

BOBBITT, J.   This Court has held: first, a purported contract imposes no binding obligations if its validity is dependent upon the provisions of an unconstitutional statute; and second, the provision of Art. I, Sec. 10, of the Federal Constitution, protecting the obligations of contracts against state action, is directed only against impairment by legislation and not by judgments of courts. *Summrell v. Racing Asso.,* 240 N.C. 614, 83 S.E. 2d 501; *Racing Asso. v. Cahoon, et al.,* 214 F. 2d 830, and cases cited.

The constitutionality of G.S. 19-1 *et seq.,* has been tested and upheld as a valid exercise of police power. *Carpenter v. Boyles,* 213 N.C. 432, 196 S.E. 850; *Barker v. Palmer,* 217 N.C. 519, 8 S.E. 2d 610; *Summrell v. Racing Asso.,* 239 N.C. 591, 80 S.E. 2d 638.

Whenever it is adjudged that a nuisance as defined in G.S. 19-1 is kept, maintained and exists, abatement by injunction as provided in G.S. 19-2 is the statutory remedy.   True, the effectual closing of the nuisance premises against use for any purpose is for one year, unless sooner released.   G.S. 19-5.   The court may, if the owner appears and pays all costs of the proceeding and files an approved bond conditioned that he will immediately abate the nuisance and prevent its re-establishment within one year and satisfies the court of his good faith, cancel the order of abatement and deliver the premises to the owner.   G.S. 19-7.   In the absence of such cancellation, the personal property seized by the sheriff is to be sold as in case of a sale under execution, the proceeds therefrom

applied in payment of the costs of action and abatement, and the balance, if any, paid to the owner. G.S. 19-5 and 19-16. No application for cancellation of the order of abatement under G.S. 19-7 has been made. No application or order for sale of personal property under G.S. 19-5 and 19-6 has been made. The rights of defendant under these statutes are available now upon its motion. While we deem it appropriate to advert to these statutory provisions, no assignment of error challenges the judgment of the court below for failure to accord the defendant its rights thereunder. Indeed, the statutes themselves are attacked as unconstitutional.

Is the Morehead City Act void as being in violation of limitations upon legislative power imposed by the Constitution of North Carolina? This is the question upon which decision here depends.

On the first appeal in the *Summrell case,* 239 N.C. 591, 80 S.E. 2d 638, the defendant there contended that the constitutionality of the Currituck Act then under consideration was not before this Court for determination, relying largely upon *Amick v. Lancaster,* 228 N.C. 157, 44 S.E. 2d 733. Bearing upon the question, this Court said:

"In *Amick v. Lancaster, supra,* the action was brought under G.S. 19-1, *et seq.* The plaintiff sought to enjoin as a nuisance the operation of a liquor store by 'The Town of Louisburg Board of Alcoholic Control' pursuant to Ch. 862, 1947 Session Laws. The Court held that since the alcoholic control board was acting 'under color of legislative authority' the remedy by action under G.S. 19-1, *et seq.,* 'seems inappropriate.' It is to be noted that the plaintiff in *Amick v. Lancaster, supra,* sought to enjoin the operations of a governmental board acting 'under color of legislative authority.' Whether the rationale of the decision would apply equally to a private person, firm, association or corporation is open to serious question. Be that as it may, the 1949 Currituck Act (Ch. 541, 1949 Session Laws) being unconstitutional and therefore void as declared in *S. v. Felton, ante,* 575, there is error in the judgment below dismissing the action; and the cause is remanded for further proceedings."

Further consideration convinces us that the ruling in *Amick v. Lancaster, supra,* should be restricted to actions to enjoin the operations of a governmental board acting "under color of legislative authority," and should not be extended to actions to enjoin the operations of a private person, firm, association or corporation acting "under color of legislative authority," and we so hold.

We consider the Morehead City Act first in relation to these provisions of our fundamental law, set out under the caption "Declaration of Rights," of the Constitution of North Carolina, viz.:

"Article I, Section 7, which provides: 'Exclusive emoluments, etc.— No man or set of men are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services.'

"Article I, Section 31, which provides: 'Perpetuities, etc.—Perpetuities and monopolies are contrary to the genius of a free state and ought not to be allowed.'"

In *S. v. Felton*, 239 N.C. 575, 80 S.E. 2d 625, where the 1949 Currituck Act was held unconstitutional, this Court held that betting on dog races under a pari-mutuel system having no other purpose than that of providing the facilities by means of tickets, machines, etc., for placing bets, calculating odds, determining winnings, if any, constitutes gambling within the meaning of the statutes presently codified G.S. 16-1, G.S. 16-2, and G.S. 14-292. We refer to the *Felton case* for a full discussion with citations of authority on this point. So, under the general statutes and upon the undisputed facts, the defendant was engaged in the business of operating a gambling establishment incident to its conduct of dog races, subject to abatement by injunction as a statutory nuisance under G.S. 19-1 *et seq.*, unless exempted from its application by the Morehead City Act.

The Morehead City Act (Ch. 540, Public-Local and Private Laws of 1939) was amended first by Ch. 75, Public-Local Laws of 1941, hereinafter called the 1941 amendment, and later by Ch. 616, Session Laws of 1949, hereinafter called the 1949 amendment.

Section 1 of the Morehead City Act creates the Morehead City Racing Commission, consisting of three members. The original members are to be appointed by the Board of Commissioners of the Town of Morehead City, for one, two and three years, respectively, and at the expiration of the first term of each member his successor is to be appointed for a term of four years. In the event of a vacancy, the unexpired portion of his term shall be filled by the remaining members of the Commission; and in the event they cannot agree on the new member the Mayor of the Town of Morehead City is to act with them in filling the vacancy. The salaries of the members of the Commission are to be fixed by a committee of *three,* consisting of the Commission's chairman, the Mayor of the Town of Morehead City, "and a duly authorized representative of *the* person, firm, or corporation or association to whom *the* franchise or privilege hereinafter referred to is granted." (Italics added.) The Commission is directed to organize, elect a chairman, a vice-chairman and a treasurer. The treasurer is required to file with the Board of Commissioners of the Town of Morehead City a $5,000.00 bond for the faithful performance of his duties. The Commission is given authority to employ necessary clerical and legal assistance.

Section 2 vests in the Commission full authority "to grant to any person, firm, association or corporation a franchise or privilege for a term of years, not to exceed ten, to construct, own, lease, operate and maintain a race course or driving park for trotting, pacing and running races for

horses and dogs in the manner hereinafter set out." Section 2 (a) provides that no franchise or privilege shall be granted to a licensee unless and until the Commission is satisfied as to its "financial responsibility and ability to comply with all the rules and regulations of the Commission" and that it "is fully able to financially and otherwise maintain and operate its properties in accordance with such rules and regulations as the commission shall from time to time prescribe."

Section 2 (b) provides that "as a prerequisite to the issuance of the franchise or privilege, the said person, firm, association or corporation desiring said franchise or privilege shall at the time of making application therefor pay to the said commission the following charges or fees:

"First: For the franchise or privilege sought to be granted, a sum to be agreed upon as annual rental or lease for the grounds for the term of the franchise or privilege.

"Second: In the event such franchise or privilege is granted, the person, firm, association, or corporation shall also pay to the commission for each day or part of day during which races or racing is conducted, a sum equivalent to ten per cent (10%) of the gross receipts derived from all sources or operations connected with or incident to the operation of such races or racing conducted during such day or part of day. In no event, however, the amount so paid to exceed the amount of five thousand dollars ($5,000.00) per day and said amount to be paid in addition to any tax as may be now or hereafter fixed by law on such gross receipts." The 1941 and 1949 amendments relate solely to this portion of the Morehead City Act. Originally, it was provided that in the event such franchise or privilege is granted, the licensee was required to pay to the Commission for each day or part of day during which races or racing was conducted a sum equivalent to ten per cent (10%) of the gross receipts derived from all sources or operations connected with or incident to the operation of such races or racing conducted during such day or part of day. The maximum payment required was $5,000.00 per day, "in addition to any tax as may be now or hereafter fixed by law on such gross receipts." The 1941 amendment purports to strike out *Section 2 (b) Second* and insert therefor an entirely different basis for determining the amounts to be paid by the licensee to the Commission, namely, a percentage of the total contributions to all pari-mutuel pools and a percentage of the established admission price for each person admitted to the race track premises. The 1949 amendment purports to repeal the 1941 amendment and thereupon purports to enact *Section 2 (b) Second* of the Morehead City Act as originally provided with the addition of a new paragraph, viz.:

"The term 'sum equivalent to ten per cent (10%) of the gross receipts derived from all sources' referred to above shall mean (a) ten per cent (10%) of the first monies received, derived from the operations of the

Pari Mutuel machines, after the direct return to the bettors shall have been made; (b) ten per cent (10%) of all paid admissions to the enclosure; . . ."

It is noteworthy that the franchise of 15 July, 1947, from the Commission to the defendant, with minor exceptions, is drawn in conformity with the 1949 amendment, ratified 28 March, 1949, rather than in conformity with the 1941 amendment. The interested parties, with remarkable prevision, seem to have anticipated in 1947 the passage of the 1949 amendment.

Section 3 provides that under a franchise or privilege so granted, "the said person, firm, association or corporation is hereby fully authorized and empowered to legally construct, build, lease, carry on, maintain and operate a park, driving ground or race course *on property owned or leased* by the Town of Morehead City *outside the corporate limits thereof,* but within the limits of Carteret County, and to conduct and maintain therein horse and dog races." (Italics added.) Then follows the provision relating to the core of this controversy, viz.: "That such person, firm, association or corporation is hereby expressly granted full power and authority to operate and maintain what is generally known as 'Pari Mutuel Machines or Appliances' of the kind employed and in use at recognized racing courses in America: *Provided, however,* that said Pari Mutuel Machines and Appliances shall only be maintained and operated within the enclosure of said park, driving grounds or race course and only on days or parts of days when races or racing is being therein conducted, and it shall be legal for any and all persons twenty-one years of age legally within the enclosure of said park, driving grounds or race courses while said park, driving grounds or race courses are open for racing, to participate in the operation, or become a patron of said Pari Mutuel Machines and Appliances."

Section 3 provides further that any franchise or privilege granted by the Commission to any person, firm or corporation shall be and remain irrevocable so long as such licensee complies with the terms and provisions of said franchise and complies with the rules and regulations of the said Commission promulgated from time to time and set forth in its contracts; and further, that no franchise granted shall be transferred by the licensee to any other person, firm, association or corporation except by first obtaining the written consent of the Commission.

Section 4 provides that the Commission is authorized to adopt rules and regulations from time to time which it may "deem necessary to properly carry out the intentions of this Act." The violation thereof by the holder of the franchise or by any of its officers, agents or employees is declared to be a misdemeanor.

TAYLOR v. RACING ASSO.

Section 5 provides that the governing authorities of the Town of Morehead City shall order a special election, at which "the qualified voters of said town" shall vote "For" or "Against" creating the Morehead City Racing Commission. The Act shall be in full force and effect if a majority of the qualified voters vote in favor of the creation of such Commission; otherwise, the Act shall not be in effect. However, should the voters fail to vote in favor of the creation of such Commission, other elections may be called by the governing authorities, successively, but not until six months from the previous election have expired.

Section 6 provides "That all laws and clauses of laws in conflict with the provisions of this Act are hereby repealed."

Section 7 provides "That this Act shall be in full force and effect from and after its ratification." It was ratified 3 April, 1939.

Reference to the 1949 Currituck Act and to S. v. Felton, supra, where its provisions were analyzed, will disclose immediately that the 1949 Currituck Act and the Morehead City Act are quite similar both in phraseology and in substance.

1. In each case, provision is made for an original and, if necessary, successive elections, at intervals of six months, for the purpose of voting the Act "in" without any provision whatever, once it becomes effective, for an election for the purpose of voting the Act "out."

2. In each case, under authority of the Act, the franchise is irrevocable during the term thereof except for failure to pay 10% of the licensee's gross receipts from *all* its operations and for failure to comply with the Commission's rules and regulations. See S. v. Felton, supra, for observations bearing upon such rules and regulations.

3. In each case, the provisions purporting to authorize the operation by the licensee of pari-mutuel machines within the race course enclosure incident to betting by patrons on dog races are the same.

True, there are differences, including the following:

1. The 1949 Currituck Act was to be in force and effect upon approval by the majority of the qualified voters of Currituck County *who vote* at the special election. The Morehead City Act was to be in force and effect upon approval by the majority of the qualified voters of the Town of Morehead City.

2. The 1949 Currituck Act provides for the ownership by the licensee of land in Currituck County on which the race course and apparati are located. The Morehead City Act provides that the land on which the licensee has the race course and apparati shall be *"property owned or leased by the Town of Morehead City* outside the corporate limits thereof but within the limits of Carteret County." (Italics added.)

3. The methods of appointment of the members of the Commission differ, the provisions of the 1949 Currituck Act making possible a self-perpetuating membership.

4. The period of the irrevocable franchise under the 1949 Currituck Act was 25 years while such period under the Morehead City Act is 10 years.

5. The 1949 Currituck Act expressly provides that the net proceeds from the Commission's operations shall be disbursed by it to the Currituck County School Fund (50%), to the Currituck County Welfare Fund (25%), and to the Currituck County General Fund (25%). Both the Morehead City Act and the franchise are silent as to how the Commission is to disburse the amounts received by it from the licensee other than in salaries and expenses. Probably this was an oversight.

6. The difference emphasized by the defendant on this appeal is the proviso in section 4 (a) of the 1949 Currituck Act that the Commission shall not grant "a franchise or privilege to more than one person, firm, association, or corporation, it being the intention and purpose that the operations shall be under a single management." True, the Morehead City Act does not contain such explicit language, using generally the language that the franchise might be granted to *any* person, firm, association or corporation, and thereafter referring time after time to *the* person, firm, association or corporation to which such franchise is granted. In our opinion, the Morehead City Act, like the Currituck Act, contemplates that there shall be only one franchise and licensee, *at a time;* and this conclusion seems inescapable in view of the provision of the Morehead City Act that *the salaries of the members of the Commission* shall be fixed by a committee of *three,* consisting of the Commission's chairman, the Mayor of the Town of Morehead City, "and a duly authorized representative of *the* person, firm, or corporation or association to whom *the* franchise or privilege hereinafter referred to is granted." (Italics added.)

In *S. v. Felton, supra,* the Currituck Act was held unconstitutional as violative of Article I, sec. 7, and of Article I, sec. 31, of the Constitution of North Carolina. We consider *S. v. Felton, supra,* direct authority for decision here. However, in view of the earnest insistence here and in *Summrell v. Racing Asso.,* 240 N.C. 614, 83 S.E. 2d 501, that cases cited in the *Felton case* as in accord with the conclusion reached departed from and were in conflict with a line of earlier cases, we deem it appropriate to discuss that subject further.

We refer again to the *Felton case,* where we discussed at some length *S. v. Fowler,* 193 N.C. 290, 136 S.E. 709, and *Plott v. Ferguson,* 202 N.C. 446, 163 S.E. 688, and cited later cases approving these decisions. We referred to earlier cases, cited by the defendant as in conflict with *S. v. Fowler, supra,* and decisions based thereon. Thereupon, we stated: "It would seem that *S. v. Fowler, supra,* and *Plott v. Ferguson, supra,* would constitute ample authority for a decision that the 1949 Currituck

Act is unconstitutional. However, in view of the earlier decisions cited by defendant as being in conflict and noted above, it is urged that the decisions in *S. v. Fowler, supra,* and *Plott v. Ferguson, supra,* should be reconsidered. There appears to be no necessity for doing so in relation to the statute now under consideration."

In *S. v. Fowler, supra,* which appellants state frankly in their brief "is more capable of being urged by the State as an authority for its contention here than any other case we have read," the defendant (Fowler) was indicted and convicted in Polk County under the general criminal statutes of the State relating to the unlawful manufacture, sale, possession, etc., of intoxicating liquor, and, for the first such offense, was sentenced to imprisonment as authorized by such statutes. He appealed on the ground that, while the sentence was authorized by the general criminal statutes on the subject, a later public-local act, applicable to Polk and four other named counties, provided that upon conviction for the first offense the maximum punishment was a fine of $100.00. The sentence was upheld by this Court, upon the ground that where there has been a valid enactment of a general criminal statute applicable to the whole State, a subsequent public-local act purporting to exempt offenders in five counties from the punishment prescribed by the general law, granting them a *privilege* or *immunity* not enjoyed by other residents of the State, is violative of Article I, sec. 7, of the Constitution of North Carolina, and therefore is void. Further discussion of the *Fowler case* may be found in our opinion in the *Felton case.*

Earlier cases, cited by appellant as being in conflict with the decision in the *Fowler case,* include the following:

In *S. v. Muse,* 20 N.C. 463, this Court upheld as constitutional *a general criminal statute* prohibiting the sale of spirituous liquors and other articles near a church, meeting house, or other place where persons are assembled for divine worship, except by licensed stores and taverns. We quote from the opinion of *Chief Justice Ruffin:* "There can be no doubt that the Legislature hath power, and that there is an obligation in sound morals and true policy on that body to protect the decency of divine worship by prohibiting any actual interruption of those engaged in worship, or any practices at or near the place, in which the Legislature may see a tendency to produce such interruption." Again: "The object of the Legislature was to prohibit the first step towards an establishment that might draw the idle, thoughtless or dissipated from the opportunities of wholesome edification to be derived from uniting in or witnessing divine worship."

In *S. v. Joyner,* 81 N.C. 534, this Court upheld as constitutional an act, applicable only to Northampton County, prohibiting the sale of

liquor in quantities less than a quart and prohibiting all sales of liquor not of the seller's manufacture.

In *S. v. Stovall,* 103 N.C. 416, 8 S.E. 900, this Court upheld as constitutional an act prohibiting the sale of liquor, tobacco and other refreshments within one-half mile of the Fair Grounds in Northampton County unless the person was regularly engaged in business within the prohibited territory. We quote from the opinion of *Justice Davis:* "We are unable to see that any privilege or right is conferred upon 'any man or set of men' which is denied to others, nor are we able to perceive that any 'perpetuities or monopoly' is created by the act." Again: "The power of the Legislature to enact laws conferring police powers and regulating traffic, etc., within particular localities, seems to be well settled."

In *S. v. Moore,* 104 N.C. 714, 10 S.E. 143, this Court upheld as constitutional an act prohibiting the buying and selling of seed cotton in three named counties in quantity less than usually contained in a bale unless the contract be reduced to writing, etc.

In *S. v. Barringer,* 110 N.C. 525, 14 S.E. 781, this Court upheld as constitutional an act prohibiting the manufacture of liquor within three miles of the Barium Springs Orphanage without the written permission of the Superintendent.

In *S. v. Barrett,* 138 N.C. 630, 50 S.E. 506, this Court upheld as constitutional an act applicable only to Union County providing a rule of evidence, to wit, that the possession of more than one quart of whiskey within that county was *prima facie* evidence that the possession was for the purpose of sale.

It is immediately apparent that the *Joyner, Stovall, Moore, Barringer and Barrett cases* concerned statutes imposing prohibitions, restrictions and burdens in certain localities, *not in conflict* with any general criminal statute dealing with the same subject matter. They do not in any sense grant the residents or any person, firm, association or corporation in such locality *any exemption* or *privilege* not enjoyed throughout the State. Where so understood, there is no conflict between these decisions and the decision in the *Fowler case.* It is noteworthy that these decisions were prior to the effective date of Article II, sec. 29, Constitution of North Carolina, hereinafter discussed.

Legislation enacted in the exercise of the police power for the benefit of the public is as extensive as may be required *for the protection* of the public health, safety, morals and general welfare of the people. *S. v. McGee,* 237 N.C. 633, 75 S.E. 2d 783, and cases cited. Under the police power, the General Assembly may prohibit or regulate gambling. *S. v. Felton, supra,* and authorities cited. The General Assembly, by the enactment of general criminal statutes, has condemned gambling and the operation of gambling establishments. This has been done in the exercise

of the police power. The concept of the police power precludes its exercise to grant a *privilege* or *immunity* to particular persons or to persons in a particular locality permitting them to violate with impunity the general statutory laws condemning gambling and the operation of gambling establishments as inimical to the public morals.

It comes to this: It is not the fact that the Morehead City Act is a public-local law that causes it to be violative of *Article I, sec. 7,* of the Constitution of North Carolina. Rather, it is the fact that it undertakes to grant to the licensee (Racing Association, Inc.) and its patrons a *privilege* or *immunity* directly in conflict with the general statutory laws, not enjoyed by others subject thereto.

Of course, in the exercise of the police power, assuming the general statute, public-local act or municipal ordinance to be otherwise valid, reasonable classifications are upheld. *S. v. McGee, supra; Brunswick-Balke-Collender Co. v. Mecklenburg County,* 181 N.C. 386, 107 S.E. 317.

We need add nothing to what was said in *S. v. Felton, supra,* concerning public service corporations and municipal corporations; nor need we discuss further whether a county or a municipal corporation is a "man or set of men" within the meaning of Article I, sec. 7, since the defendant is a private business corporation, not a political subdivision of the State. True, the Town of Morehead City receives a fraction of the gross receipts; and is, as the petition to intervene puts it, a third party beneficiary of the franchise.

Moreover, the Morehead City Act is invalid as an unconstitutional delegation of legislative power to the *qualified voters of the Town of Morehead City.* They, and they alone, are to determine whether the Morehead City Act shall be in force and effect. The members of the Racing Commission are to be appointed by the Board of Commissioners of the Town of Morehead City. The Mayor of the Town of Morehead City is one of a committee of three to fix the salaries of the members of the Racing Commission. Although the Morehead City Act and the franchise are silent on the subject, payments to the Town of Morehead City by the Racing Commission are made and presumably the act so contemplated. The qualified voters of Carteret County, other than those in the Town of Morehead City, have no voice in determining whether the Morehead City Act shall be in force and effect nor does the county government or any agency thereof receive any of the funds disbursed by the Racing Commission. Yet the Morehead City Act has no application whatever within the corporate limits of the Town of Morehead City, it being expressly provided that the licensee is to operate the race course and pari-mutuel betting apparati on "property owned or leased by the Town of Morehead City *outside the corporate limits* thereof but within the limits of Carteret County." (Italics added.) There would seem to be no legal

difference if the Morehead City Act had attempted to authorize the establishment of such racing course with its apparati in Clay County upon approval by the qualified voters of the Town of Morehead City.

Legislative power vests exclusively in the General Assembly, Constitution of North Carolina, Article II, and, except as authorized by the Constitution, as in case of municipal corporations, may not be delegated. *Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310. While an act, otherwise valid, may be enacted so as to take effect upon approval by a majority of the qualified voters of the affected locality, *Cottrell v. Town of Lenoir,* 173 N.C. 138, 91 S.E. 827, 16 C.J.S., Constitutional Law, Section 142, and 11 Am. Jur., Constitutional Law, Section 216, the General Assembly cannot constitutionally provide that the qualified voters in one governmental unit, *e.g.,* a town, shall decide whether a statute shall be in force and effect elsewhere than in the territory comprising that particular governmental unit. *Levering v. Board of Supervisors of Elections of Baltimore City,* 137 Md. 281, 112 A. 301.

Moreover, the Morehead City Act is unconstitutional and therefore void, not only for the reasons stated above, but because it conflicts with Article II, sec. 29, of our organic law.

We are dealing here, not directly with those who bet on dog races through the pari-mutuel system, but with a private corporation operating a pari-mutuel gambling establishment. Such operation is its trade and business.

The Constitution of North Carolina provides: "The General Assembly shall not pass any *local,* private, or *special* act or resolution . . . *regulating,* labor, *trade,* mining, or manufacturing . . . *Any local,* private or *special act* or resolution passed in violation of the provisions of this section shall be void." Article II, sec. 29. (Italics added.) Submitted by the 1915 General Assembly, ratified by the electorate in 1916, effective on and after 10 January, 1917.

In *S. v. Dixon,* 215 N.C. 161, 1 S.E. 2d 521, this Court considered "An Act to Define Real Estate Brokers and Salesmen; to Provide for the Regulation, Supervision and Licensing Thereof; to Create a Real Estate Commission, and Prescribing the Powers and Duties Thereof; To Provide for the Enforcement of said Act and Penalties for the Violation Thereof." Ch. 292, Public Laws of 1937. It applied to thirty-six counties, sixty-four being expressly exempted from its provisions. It was held that real estate brokers and salesmen were engaged in *trade* within the meaning of Article II, sec. 29; and the act, upon authority of *In re Harris,* 183 N.C. 633, 112 S.E. 425, and *S. v. Warren,* 211 N.C. 75, 189 S.E. 108, was held a local and a special act void under Article II, sec. 29. In *S. v. Dixon, supra,* this Court quoted with approval from *S. v. Worth,*

116 N.C. 1007, 21 S.E. 204, that the word "trade" "includes in this sense any employment or business embarked in for gain or profit."

There can be no doubt but that the Morehead City Act is both local, *Idol v. Street,* 233 N.C. 730, 65 S.E. 2d 313, and special, *S. v. Dixon, supra,* concurring opinion of *Barnhill, J.* (now *C. J.*), if indeed it may not be considered a private act; for it purports to regulate a licensee in one locality in one county and to permit such licensee to operate there a place of business condemned as a gambling establishment by the general laws of the State. We have no hesitancy in reaching the conclusion that the defendant was engaged, and seeks to continue to engage, in a trade or business condemned by the general laws of the State, under color of the Morehead City Act. And we can perceive no valid reason why, if local and special acts regulating legitimate trade and business are invalid as violative of Article II, sec. 29, such an act purporting to regulate the operations of an unlawful trade or business would not likewise be invalid. In this connection, it is noted that the defendant, as one of its assignments of error, challenges the judgment of the court below on the ground that it forbids the continued operation of its *business* and impairs the value of its *investment.*

We shall not attempt to analyze the reasons prompting the adoption of the constitutional amendment, now Article II, sec. 29, of the Constitution of North Carolina. Full discussion, and the results of exhaustive research, may be found in the Report of Albert Coates, Director of the Institute of Government, to the Commission on Public-Local and Private Legislation authorized by the 1947 General Assembly, appearing in the February-March 1949 issue of Popular Government.

In partial explanation, the practical observations of *Bynum, J.,* in *Simonton v. Lanier,* 71 N.C. 498, seem pertinent: "Public Laws are founded on the gravest considerations of public benefit. They are deliberately enacted, are permanent in character, are for the equal benefit of all, and of universal application. Not so with private statutes. These are not of common concern, and do not receive the watchful and cautious scrutiny of the Legislature which is devoted to those of a public character. They are often procured by agents and for a purpose, who are watchful to take advantage of any relaxation in legislative vigilance."

Cases from other jurisdictions, including *Landers v. Eastern Racing Asso.,* 97 N.E. 2d 385, a Massachusetts case; *Commonwealth v. Kentucky Jockey Club,* 38 S.W. 2d 987; *S. v. Garden State Racing Asso.,* 54 A. 2d 916, a New Jersey case; *Tweel v. West Virginia Racing Com.,* 76 S.E. 2d 874, were decided against the background of constitutional and statutory provisions different from the North Carolina provisions under consideration here. Indeed, in the New Jersey case cited, it appears in the opinion

that the New Jersey Constitution was amended so as to permit pari-mutuel betting at legalized race tracks.

As stated in the *Felton case,* the General Assembly, in its exercise of the police power, has enacted general statutes on the subject of gambling in its variety of guises and disguises, including the maintenance of establishments for gambling on races and participation therein. Whether such general statutes should be repealed or modified is a matter within its sphere of power and duty.

We are concerned here with the validity of the Morehead City Act, a local and special, if not a private, act, directly in conflict with general statutes presently in force, and conclude, that, for the reasons stated, such act is unconstitutional and therefore void.

For the reasons stated, the judgment of the court below is

Affirmed.